**EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS | : | Master File No. 12-md-02311 |
| ANTITRUST LITIGATION | : | Honorable Marianne O. Battani |
| | : | |
| In Re: Wire Harness | : | Case No. 2:12-cv-00102 |
| In Re: Instrument Panel Clusters | : | Case No. 2:12-cv-00202 |
| In Re: Fuel Senders | : | Case No. 2:12-cv-00302 |
| In Re: Heater Control Panels | : | Case No. 2:12-cv-00402 |
| In Re: Bearings | : | Case No. 2:12-cv-00502 |
| In Re: Alternators | : | Case No. 2:13-cv-00702 |
| In Re: Anti Vibrational Rubber Parts | : | Case No. 2:13-cv-00802 |
| In Re: Windshield Wiper Systems | : | Case No. 2:13-cv-00902 |
| In Re: Radiators | : | Case No. 2:13-cv-01002 |
| In Re: Starters | : | Case No. 2:13-cv-01102 |
| In Re: Ignition Coils | : | Case No. 2:13-cv-01402 |
| In Re: Motor Generators | : | Case No. 2:13-cv-01502 |
| In Re: HID Ballasts | : | Case No. 2:13-cv-01702 |
| In Re: Inverters | | Case No. 2:13-cv-01802 |
| In Re: Electronic Powered Steering Assemblies | | Case No. 2:13-cv-01902 |
| In Re: Air Flow Meters | | Case No. 2:13-cv-02002 |
| In Re: Fan Motors | | Case No. 2:13-cv-02102 |
| In Re: Fuel Injection Systems | | Case No. 2:13-cv-02202 |
| In Re: Power Window Motors | | Case No. 2:13-cv-02302 |
| In Re: Automatic Transmission Fluid Warmers | | Case No. 2:13-cv-02402 |
| In Re: Valve Timing Control Devices | | Case No. 2:13-cv-02502 |
| In Re: Electronic Throttle Bodies | | Case No. 2:13-cv-02602 |
| In Re: Air Conditioning Systems | | Case No. 2:13-cv-02702 |
| In Re: Windshield Washer Systems | | Case No. 2:13-cv-02802 |
| In Re: Spark Plugs | | Case No. 2:15-cv-03002 |
| In Re: Automotive Hoses | | Case No. 2:15-cv-12893 |
| In Re: Power Window Switches | | Case No. 2:16-cv-03902 |
| In Re: Ceramic Substrates | | Case No. 2:16-cv-12194 |

THIS DOCUMENT RELATES TO
AUTOMOBILE DEALERSHIP ACTIONS

## LAW OFFICES OF GEORGE A. BARTON, P.C.'S MOTION FOR AN AWARD OF ATTORNEYS' FEES RELATED TO ITS REPRESENTATION OF THE KANSAS AND NEVADA AUTO DEALER PLAINTIFFS

The Law Offices of George A. Barton, P.C., attorneys for Auto Dealer Plaintiffs Dale Martens Nissan Subaru, Inc., Green Team of Clay Center, Inc., Ancona Enterprises, Inc. d/b/a Frank Ancona Honda, Herb Hallman Chevrolet, Inc., Reno Dodge Sales, Inc., and Bill Pearce Honda, hereby move the Court, pursuant to Fed. R. Civ. P. 23(h), for an award of $695,228.30 in attorneys' fees for its legal work in this MDL through October 3, 2016, to be paid from the anticipated attorneys' fee award requested by Plaintiffs Interim Co-Lead Counsel from the second group of Auto Dealer Class Settlements.

Dated: October 12, 2016            Respectfully submitted,

           */s/ Robert G. Harken*
           George A. Barton      KS Bar No. 26831
           Robert G. Harken      KS Bar No. 21450
           Law Offices of George A. Barton, P.C.
           7227 Metcalf Ave., Ste. 301
           Overland Park, KS 66204
           (816) 300-6250– phone
           (816) 300-6259 – fax
           gab@georgebartonlaw.com
           rob@georgebartonlaw.com

           ***ATTORNEYS FOR THE KANSAS AND NEVADA AUTO DEALERS***

### CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October, 2016 a true and correct copy of the foregoing was served to all parties and counsel of record via the Court's electronic filing system.

           *s/ Robert G. Harken*
           Robert G. Harken

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS | : | Master File No. 12-md-02311 |
| ANTITRUST LITIGATION | : | Honorable Marianne O. Battani |
| | : | |
| In Re: Wire Harness | : | Case No. 2:12-cv-00102 |
| In Re: Instrument Panel Clusters | : | Case No. 2:12-cv-00202 |
| In Re: Fuel Senders | : | Case No. 2:12-cv-00302 |
| In Re: Heater Control Panels | : | Case No. 2:12-cv-00402 |
| In Re: Bearings | : | Case No. 2:12-cv-00502 |
| In Re: Alternators | : | Case No. 2:13-cv-00702 |
| In Re: Anti Vibrational Rubber Parts | : | Case No. 2:13-cv-00802 |
| In Re: Windshield Wiper Systems | : | Case No. 2:13-cv-00902 |
| In Re: Radiators | : | Case No. 2:13-cv-01002 |
| In Re: Starters | : | Case No. 2:13-cv-01102 |
| In Re: Ignition Coils | : | Case No. 2:13-cv-01402 |
| In Re: Motor Generators | : | Case No. 2:13-cv-01502 |
| In Re: HID Ballasts | : | Case No. 2:13-cv-01702 |
| In Re: Inverters | | Case No. 2:13-cv-01802 |
| In Re: Electronic Powered Steering Assemblies | | Case No. 2:13-cv-01902 |
| In Re: Air Flow Meters | | Case No. 2:13-cv-02002 |
| In Re: Fan Motors | | Case No. 2:13-cv-02102 |
| In Re: Fuel Injection Systems | | Case No. 2:13-cv-02202 |
| In Re: Power Window Motors | | Case No. 2:13-cv-02302 |
| In Re: Automatic Transmission Fluid Warmers | | Case No. 2:13-cv-02402 |
| In Re: Valve Timing Control Devices | | Case No. 2:13-cv-02502 |
| In Re: Electronic Throttle Bodies | | Case No. 2:13-cv-02602 |
| In Re: Air Conditioning Systems | | Case No. 2:13-cv-02702 |
| In Re: Windshield Washer Systems | | Case No. 2:13-cv-02802 |
| In Re: Spark Plugs | | Case No. 2:15-cv-03002 |
| In Re: Automotive Hoses | | Case No. 2:15-cv-12893 |
| In Re: Power Window Switches | | Case No. 2:16-cv-03902 |
| In Re: Ceramic Substrates | | Case No. 2:16-cv-12194 |

THIS DOCUMENT RELATES TO
AUTOMOBILE DEALERSHIP ACTIONS

**LAW OFFICES OF GEORGE A. BARTON, P.C.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN AWARD OF ATTORNEYS' FEES RELATED TO ITS REPRESENTATION OF THE KANSAS AND NEVADA AUTO DEALER PLAINTIFFS**

In accordance with E.D.Mich. L.R. 7.1(a), the undersigned counsel requested Plaintiffs' Interim Co-Lead Counsel's ("the ICLC") agreement to the Law Offices of George A. Barton, P.C.'s ("the Barton Law Firm") proposed award of attorneys' fees discussed herein. The undersigned counsel did not obtain ICLC's agreement to the attorneys' fees requested herein.

## I. INTRODUCTION

Since February 2012, the Barton Law Firm has actively and continuously represented the six named Kansas and Nevada Auto Dealer Plaintiffs[1] in this multidistrict litigation ("MDL"). During this 4½ year period, the Barton Law Firm has provided extensive legal services which have benefitted the Kansas and Nevada Auto Dealer Class members. The Barton Law Firm's lodestar (hours worked multiplied by the applicable hourly rates) through October 3, 2016 is approximately $556,880. The Barton Law Firm is requesting that an award of $695,228.30 in attorneys' fees for its legal work in this case through October 3, 2016, to be paid from the anticipated attorneys' fee award requested by the ICLC from the second group of Auto Dealer Class Settlements with thirty-two defendants ("the second Class Settlement fee award"). The requested $695,228.30 fee award is in addition to the $47,976.48 in attorneys' fee paid by the ICLC to the Barton Law Firm from the $18,500,158 in attorneys' fees which this Court awarded to the ICLC by Order entered on December 7, 2015 ("the first Class Settlement fee award"). (*See* Dk. 401, Case No. 12-cv-00102).

---

[1] The Auto Dealers from the State of Kansas who are named plaintiffs in the MDL are Dale Martens Nissan Subaru, Inc., Green Team of Clay Center, Inc., and Ancona Enterprises, Inc. d/b/a Frank Ancona Honda. The Auto Dealers from the State of Nevada who are the named plaintiffs in the MDL are Herb Hallman Chevrolet, Inc., Reno Dodge Sales, Inc., and Bill Pearce Honda.

2

The Barton Law Firm's requested fee award of $695,228.30, coupled with the $47,976.48 in fees it has received from the first Class Settlement fee award, represents approximately 50 percent of the estimated attorneys' fees award which have been or will be allocated to the Kansas and Nevada Class Settlements, respectively. The Barton Law Firm's requested fee award of $695,228.30, coupled with the $47,976.48 in attorneys' fees it has received from the first Class Settlement fee award, also equates to a reasonable lodestar multiplier of 1.33.

For the reasons discussed below, this Court should award the Barton Law Firm $695,228.30 for its work through October 3, 2016, in addition to the $47,976.48 in attorneys' fees which it has been paid from the first Class Settlement fee award.

## II. The Estimated Attorneys' Fees Allocated To the Kansas and Nevada Auto Dealer Class Settlements Are In The Amount of $1,486,409.

On October 14, 2015, the ICLC filed their first motion for attorneys' fees to be paid from the first group of Auto Dealer Class Settlements in the approximate amount of $59,000,000 entered into between the Auto Dealer Classes and twenty-one defendants. (*See* Dk. 379, Case No. 12-cv-00102). In their first request for attorneys' fees, the ICLC did not include the time value of the legal work provided by the Barton Law Firm. (*Id.*). On December 7, 2015, this Court awarded the ICLC $18,500,158 in attorneys' fees. (*See* Dk. 401, Case No. 12-cv-00102). The award of attorneys' fees in the amount of $18,500,158 represented approximately 31 percent of the $59,000,000 settlement amount. The ICLC has allocated 1.7 percent of the $59,000,000 of the settlement to the Kansas Auto Dealer Class, which equals $1,003,000, and allocated 0.9 percent of the $59,000,000 settlement to the Nevada Auto Dealer Class, which equals $531,000. (Ex. 1). Similarly, 1.7 percent of the $18,500,158 in attorneys' fees awarded by this Court is attributed to the Kansas Auto Dealer Class Settlement, which equals $314,502.69, and 0.9 percent of the

3

$18,500,158 is attributed to the Nevada Auto Dealer Class Settlement, which equals $166,501.42. (Ex. 1).

The Auto Dealer Classes have now reached settlements in the amount of $124,730,980 with thirty-two additional defendants. (Ex. 2, p. 14). The 1.7 percent of the $124,730,980 settlement attributed to the Kansas Auto Dealer Class is $2,120,426.66. The 0.9 percent of the $124,730,980 settlement attributed to the Nevada Auto Dealer Class is $1,122,578.82. The ICLC have indicated that they will request fees in the amount of up to one-third of the $124,730,980 settlement funds. (Ex. 2, p. 18). If this Court were to award attorneys' fees based upon the 31 percent of the $124,730,980 settlement fund which it previously awarded, the total fee award for the second Class Settlement would be in the amount of $38,669,440.30. The 1.7 percent of the $38,669,440.30 second Class Settlement fee award attributed to the Kansas Auto Dealer Class Settlement would be $657,380.49, and the 0.9 percent of the $38,669,440.30 second Class Settlement fee award attributed to the Nevada Auto Dealer Class Settlement would be $348,024.96.

Thus, the total attorneys' fees allocable to the Kansas and Nevada Class Settlements, for both the first and second Class Settlements, is estimated to be approximately $1,486,409.

III.    **Summary of Work Performed by The Barton Law Firm For The Benefit of the Kansas and Nevada Auto Dealer Classes.**

The six Kansas and Nevada Auto Dealer Plaintiffs in this MDL have retained and signed fee agreements with the Barton Law Firm to represent them in their claims against the named Defendants in the MDL. (Harken Aff. ¶ 3). In February 2012, the ICLC contacted the Barton Law Firm to discuss the Barton Law Firm's involvement in the MDL and whether the Kansas and Nevada Auto Dealer Plaintiffs were willing to join with other dealerships from around the country in pursuing nationwide price-fixing claims against the Defendants in a single MDL proceeding.

4

(Harken Aff. ¶ 2). Between February 2012 and October 3, 2016, at the request of the ICLC and on behalf of Kansas and Nevada Auto Dealers, the Barton Law Firm has worked with the Kansas and Nevada Auto Dealer Plaintiffs to advance their claims against the Defendants in this MDL. Such work includes:

1) Six separate trips to Nevada, and five separate driving trips to Clay Center, Kansas and Manhattan, Kansas to work with the Kansas and Nevada Auto Dealer Plaintiffs in all aspects of the MDL litigation. Throughout their participation in this MDL, the Kansas and Nevada Auto Dealer Plaintiffs almost always met with the Barton Law Firm to work on and discuss their MDL claims. The Kansas and Nevada Auto Dealer Plaintiffs have not met with the ICLC or other law firms representing the Plaintiffs, except for a few rare occasions when another attorney participated in a phone conference with the Kansas and/or Nevada Auto Dealer Plaintiffs or participated in Champion's and Reno Dodge's Rule 30(b)(6) deposition. (Harken Aff. ¶¶ 6(a) - (g)).

2) Answering written discovery, which has included hundreds of numerous telephone and email conferences between the Barton Law Firm and the ICLC to discuss Defendants' discovery requests and other discovery issues, as well as numerous telephone and email conferences between the Barton Law Firm and the Kansas and Nevada Auto Dealer Plaintiffs to discuss the scope of the discovery requests, the Kansas and Nevada Auto Dealer Plaintiffs' responsibilities in answering the written discovery requests, and otherwise helping the Kansas and Nevada Auto Dealer Plaintiffs respond to the written discovery requests. (Harken Aff. ¶ 6(b)).

3) Reviewing thousands of dealer files in order to gather Kansas and Nevada Auto Dealer Plaintiffs' new car invoices in response to Defendants' discovery requests. In order to

5

produce the Kansas and Nevada Auto Dealers' new car invoices, the Barton Law Firm was required to: (1) meet with the Kansas and Nevada Auto Dealer Plaintiffs to explain why the new car invoices were important; (2) work out logistics on the production of the new car invoices in order to make such production as efficient as possible; (3) travel three separate times to Clay Center, Kansas to work with Green Team Automotive to produce the new car invoices; (4) travel two separate times to Reno, Nevada for several days to work with Champion Chevrolet, Reno Dodge, and Bill Pearce Honda to produce new car invoices; and (5) travel to Frank Ancona Honda in Olathe, Kansas for several weeks to pull boxes in storage, review files, and gather and produce copies of new car invoices. (Harken Aff. ¶ 6(c)).

4) Reviewing thousands of pages of additional documents in order to produce documents responsive to Defendants' discovery requests, such as the Kansas and Nevada Auto Dealer Plaintiffs' financial statements, pay-sheets, and month-end OEM reports. Again, the Barton Law Firm traveled to the Kansas and Nevada Auto Dealer Plaintiffs' locations in Clay Center, Kansas and Reno, Nevada to gather, copy, and produce the documents. (Harken Aff. ¶ 6(d)).

5) Working with the Kansas and Nevada Auto Dealers to provide access to their data management systems, which required numerous phone conferences with the Kansas and Nevada Auto Dealer Plaintiffs to ensure access to the dealers' data management systems and answer questions regarding protecting proprietary information. (Harken Aff. ¶ 6(e)).

6) Preparation for the depositions of the Kansas and Nevada Auto Dealer Plaintiffs' Rule 30(b)(6) depositions, which included two trips to Reno, Nevada and one trip to Manhattan, Kansas to meet with Reno Dodge, Herb Hallman, and Green Team to discuss and prepare

6

for their Rule 30(b)(6) depositions and present and represent Reno Dodge, Herb Hallman, and Green Team at their Rule 30(b)(6) depositions. (Harken Aff. ¶ 6(f)).

## IV. ARGUMENT

The Barton Law Firm is requesting the Court, not the ICLC, to exercise its authority over its award of attorneys' fees to the ICLC from the second Class Settlement Funds and award the Barton Law Firm $695,228.30 for its work through October 3, 2016. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 278-79 (1980) (recognizing a court's jurisdiction to award a lawyer who helps create a common fund reasonable attorneys' fees from the common fund). Indeed, when awarding attorneys' fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved. *Rawlings v. Prudential-Bache Props, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). Under Sixth Circuit law, where counsel's efforts create a substantial common fund for the benefit of the Class, they are entitled to payment from the fund and based on a percentage of that fund. *Smillie v. Park Chemical Co.*, 710 F.2d 271, 275 (6th Cir. 1983); *Rankin v. Rots*, Case No. 02-CV-71045, 2006 WL 1791377, **1-2 (E.D. Mich. June 27, 2006). Absent adequate compensation, counsel will not be willing to undertake the risk of common fund class action litigation. *Rankin*, 2006 WL 1791377, at *1. In the Sixth Circuit, an award of reasonable attorneys' fees should consider: (1) the value of the benefit rendered to the class; (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis (lode-star cross-check); (5) the complexity of the litigation; and (6) the professional skill and standing of counsel on both sides. *Id.* (citing *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974)).

7

Further, in MDL litigation, the common benefit doctrine recognizes a federal court's inherent authority, in the exercise of its equity jurisdiction, to prevent unjust enrichment by those who benefit from the efforts of counsel whose risk, investment, and effort generates, enhances, or protects a fund or benefit enjoyed by such beneficiaries. *In re NuvaRing Prod. Liab. Litig.*, Case No. 08-mdl-1964-RWS, 2014 WL 7271959, *2 (E.D. Mo. Dec. 18, 2014). Based on the first and second wave of settlements between the Auto Dealer Plaintiffs and the settling defendants, Class Settlement funds in the approximate combined amount of $183 million have been created in this MDL. The members of the Kansas and Nevada Auto Dealer Classes have, and will continue to file claims to recover their damages from the $183 million in combined Class Settlement funds. The fact that the Barton Law Firm has not been appointed as one of the ICLC is irrelevant: the Court's supervision of the Class Settlement funds provides the authority to reward the Barton Law Firm for its contribution for its creation. Newberg on Class Actions § 15:60 (5th Ed.). The measuring stick of the Barton Law Firm's entitlement to a fee comes back to the single question of whether the Barton Law Firm's legal work did in fact create, enhance, preserve, or protect the fund under the Court's supervision. *Id; Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Employees Ret. Sys.*, 814 F.3d 653, 659-60 (2nd Cir. 2016) (even though non-lead counsel did not enter its appearance, non-lead counsel was entitled to its attorneys' fees for work done after the appointment of lead counsel that substantively benefited the class); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 182 (3rd Cir. 2005) (recognizing under the common fund doctrine, non-lead counsel may recover their attorneys' fees if they performed work at the request of lead counsel that benefited the class as a whole); *Gottlieb v. Barry*, 43 F.3d 474, 489 (10th Cir. 1994) (we fail to see why the work of counsel later designated as class counsel should be fully compensated, while the

8

work of counsel who were not later designated class counsel, but on whose shoulders class counsel admittedly stood, should be wholly uncompensated).

## A. The Barton Law Firm's Legal Work Provided a Substantial Benefit to the Kansas and Nevada Automobile Dealer Classes.

The six Kansas and Nevada Auto Dealer Plaintiffs have only entered into fee agreements with the Barton Law Firm. (Harken Aff. ¶ 3). Since February 2012, the Barton Law Firm has continuously worked with the six Kansas and Nevada Auto Dealer Plaintiffs in their claims against Defendants. (Harken Aff. ¶¶ 2-6). As this Court and ICLC have already recognized, without the efforts of the Barton Law Firm and the Kansas and Nevada Auto Dealer Plaintiffs shouldering the substantial burden in representing the absent class members, the first two group of settlements between the Auto Dealer Plaintiffs and the settling Defendants would not have been possible. (Dk. No. 1398, Case No. 12-md-2311, Dk. No. 379, Case No. 12-cv-00102). Moreover, the approximate combined amount of $183 million in Class Settlements were reached in the face of formidable opposition from the Defendants, who have sharply focused their discovery efforts on the Auto Dealer Plaintiffs. (Dk. No. 1398, pp. 2-3, Case No. 12-md-2311). Responding to Defendants' discovery, and the discovery that remains ongoing, has consumed an enormous amount of time and resources for all Auto Dealer Plaintiffs and their counsel. (*Id.*). The Auto Dealer Plaintiffs, including the Kansas and Nevada Auto Dealer Plaintiffs, have responded to voluminous discovery that requested hard copy and electronic data regarding the dealerships acquisition and sale of vehicles spanning a fourteen-year period. (*Id.*; Harken Aff. ¶ 6(a)-(g)).

In representing the Kansas and Nevada Auto Dealer Plaintiffs since February 2012, the Barton Law Firm has expended almost 1000 hours in (1) traveling to and meeting with the Kansas and Nevada Auto Dealer Plaintiffs to discuss the scope of all of the various claims and cases filed against the Defendants in this MDL; (2) working with the Kansas and Nevada Auto Dealer

9

Plaintiffs in all matters related to discovery, including traveling numerous times for several days or weeks at a time in order gather, copy, and produce documents and electronic data responsive to Defendants' discovery requests; (3) meeting, discussing, preparing and appearing for the Kansas and Nevada Auto Dealer Plaintiffs' 30(b)(6) depositions; (4) and all other necessary activities required to prosecute the claims on behalf of the Kansas and Nevada Auto Dealer Plaintiffs in the MDL. (Harken Aff. ¶¶ 2-6). All of the substantial work and discovery tasks performed by the Barton Law Firm were done at the request of ICLC. (*Id.* at ¶ 7).

There can be no real dispute that the Barton Law Firm's legal work substantially benefited the Kansas and Nevada Auto Dealer Class members in this MDL. Based on the efforts of the Kansas and Nevada Auto Dealer Plaintiffs and the Barton Law Firm, the Auto Dealer Plaintiffs and the settling Defendants agreed to two groups of settlements which resolved numerous claims in this MDL and created $183 million in Class Settlement funds. (Dk. No. 1398, Case No. 12-md-2311; Dk. No. 379, Case No. 12-cv-00102). All members of the Kansas and Nevada Auto Dealer Classes will be able to share in the receipt of monetary payments from the approximate $183 million in Class Settlement funds. (Dk. No. 1398, p. 2, Case No. 12-md-2311).

**B.      The Barton Law Firm's Request for $695,228 in Attorneys' Fees Is Reasonable.**

This Sixth Circuit has had held that in common fund cases, "a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir 2016) (citing *Rawlings*, 9 F.3d at 516). Further, the standard for attorneys' fee awards in common fund cases is that they be reasonable under the circumstances. *New York State Teachers' Retirement Sys. v. Gen. Motors Co.*, Case No. 14-11191-LVP, 2016 WL 2907968, at *14 (E.D. Mich. May 19, 2016). When awarding attorneys' fees based on a percentage of a common fund, the following factors are

evaluated by the district courts of the Sixth Circuit: (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis [the lodestar cross-check]; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel on both sides. *Gascho*, 822 F.3d at 280; *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194-97 (6th Cir. 1974).

The ICLC has already determined that 2.6% of the total amount of attorneys' fees awarded in this MDL is attributable to the Kansas and Nevada potion of this litigation. (Ex. 1). Further, the Court has already awarded the ICLC $18,500,158 from the first wave of settlements, which is approximately 31 percent of the first Class Settlement fund secured for the benefit of the eligible Auto Dealer Class members. (Dk. 401, Case No. 12-cv-00102). Assuming the same percentage is awarded to the ICLC from the second Class Settlement fund in the amount of approximately $124,740,130, the ICLC will receive an additional $38,669,440.30, for a total attorneys' fee award of $57,169,598.30. Therefore, 2.6% of the total attorneys' fees attributable to the Nevada and Kansas Auto Dealers' claims in this MDL equals $1,486,409.56. Based on the six factors discussed below, the Court should apportion the Barton Law Firm one-half of the $1,486,409.56, which equals $743,204.78. Then, after taking into account the ICLC's previous referral payment of $47,976.48 from the first Class Settlement fee award, award the Barton Law Firm $695,228.30, which is only 1.3% of the total attorneys' fees awarded to ICLC.[2]

---

[2] The Barton Law Firm's request to recover $695,228.30 does not address what fees should be awarded to the Barton Law Firm based on any future settlements between the Auto Dealer Plaintiffs and Defendants, nor addresses reimbursement of litigation expenses. The Barton Law Firm's request to recover $695,228.30 in attorneys' fees is therefore made without prejudice to any future requests by the Barton Law Firm to recover additional attorneys' fees based on any future settlements between the Auto Dealer Plaintiffs and Defendants and to recover unreimbursed litigation expenses incurred by Barton in this class action MDL.

This Court awarding the Barton Law Firm $695,228.30 is reasonable under the Sixth Circuit's factors and the facts of this case. With respect to factor 1, the Barton Law Firm has already demonstrated the value of the benefit to the Kansas and Nevada Auto Dealer Classes rendered by the Barton Law Firm's work in this MDL. (*Supra*, pp. 8-10). Indeed, even the ICLC's previous request for attorney fees focused significantly on the discovery burdens imposed on Auto Dealers and their counsel by the Defendants to impede the advancement of this MDL litigation (*see* e.g., Dk. No. 379, Case No. 12-cv-00102), and the Barton Law Firm's legal services have and will continue to focus significantly on Kansas and Nevada Auto Dealers' responses to the combative discovery burdens imposed on them. Moreover, the Barton Law Firm is the only firm to have directly work with the Kansas and Nevada Auto Dealers regarding the production of invoices and other documents in the MDL litigation. (Harken Aff. ¶ 6(a)-(g)). Further, while one other attorney participated in Reno Dodge's and Champion's deposition, the Barton Law Firm was also the only attorney which met with and presented Green Team Automotive for its deposition. (Harken Decl. ¶ 6(f)).

Next, even though the ICLC did not include the Barton Law Firm's fees in the ICLC's previous motion for an award of attorneys' fees, the Court can conduct the lodestar cross-check. As shown in the affidavit submitted with this motion, the attorneys and professional staff for the Barton Law Firm have worked almost 1000 hours in the MDL through October 3, 2016. (Harken Aff. ¶ 12). Applying the rates charged by the Barton Law Firm to the hours expended yields a "lodestar" of $556,880, which provides a 1.33 lodestar multiplier. (Harken Aff. ¶¶ 12 and 16). An award of attorneys' fees based on a 1.33 lodestar multiplier is lower than many other lodestar multipliers in other cases awarding attorneys' fees. *See*, e.g., *In re Prandin Direct Purchaser Antitrust Litig.*, Case No. 10-cv-12141-AC-DAS, 2015 WL 1396473, *4 (E.D. Mich. Jan. 20,

12

2015) (finding a multiplier of 3.01 "reasonable in light of what has been routinely accepted as fair and reasonable in complex matters such as this one") (*citing*, *Bailey v. AK Steel Corp.*, Case No. 1:06-cv-468, 2008 U.S. Dist. LEXIS 18838 at \*7 (S.D. Ohio Feb. 28, 2008)(awarding multiplier of 3.04, noting that "[c]ourts typically…increas[e] the lodestar amount by a multiplier of several times itself" and identifying a "normal range of between two and five); *Manners v. American Gen. Life Ins. Co.*, Civil Action No. 3-98-0266, 1999 U.S. Dist. LEXIS 22880, at \*93 (M.D. Tenn. Aug. 11, 1999) (3.8 multiplier); *In re Cardinal Health Sec. Litig.*, 528 F. Supp.2d 752, 770 (S.D. Ohio 2007) (multiplier 5.9)).

Under factor 3, the Barton Law Firm is the only law firm with a contingency fee agreement with the Kansas and Nevada Auto Dealers, and shares the same risks as the ICLC has with their contingency fee agreements with their own clients. While there is no question that the ICLC has done significant work which has substantially benefited other Auto Dealer Class members in this MDL, including the Kansas and Nevada Auto Dealer Class members, the ICLC was still required to perform this work on behalf of its Auto Dealer Plaintiffs that have signed contingent fee agreements with the ICLC. As a result, the ICLC's legal services substantially increased the value of their own cases with their own Auto Dealer Plaintiffs for which they will be compensated. Thus, the Court should guard against double recovery and avoid enriching the ICLC based on the Barton Law Firm's legal services. *In re NuvaRing Prod. Liab. Litig.*, 2014 WL 7271959, at \*2.

Finally, the ICLC requested and was fully aware that the Barton Law Firm was providing significant legal services which benefited the Kansas and Nevada Automobile Dealer Classes. This work included the gathering, producing, and otherwise responding to Defendants' massive discovery burdens on the Kansas and Nevada Auto Dealers. (Harken Aff. ¶ 6(a)-(e)). In addition, the ICLC requested that Barton meet with the Kansas and Nevada Auto Dealers to prepare them

13

for their Rule 30(b)(6) depositions. (Harken Aff. ¶ 6(f)-(g)). As this Court is more than aware, the Auto Dealer Plaintiffs' discovery responses and deposition testimony has been utilized in almost all of the dispositive and combative pleadings filed in this case. Thus, because responding to Defendants' discovery burden and presenting the Kansas and Nevada Auto Dealer Plaintiffs were major components in this MDL litigation, there can be no legitimate dispute that the Barton Law Firm has met factors 4, 5, and 6, and possessed the necessary skill and experience supporting its fee request.

## CONCLUSION

For the foregoing reasons, this Court should enter an order which awards the Barton Law Firm $695,228.30 for its fair share of the attorneys' fees to be awarded by this Court to the ICLC in this MDL from the Second Class Settlement fee award, and for such other relief this Court deems just and fair.

Respectfully submitted,

*/s/ Robert G. Harken*
George A. Barton    KS Bar No. 26831
Robert G. Harken    KS Bar No. 21450
Law Offices of George A. Barton, P.C.
7227 Metcalf Ave., Ste. 301
Overland Park, KS 66204
(816) 300-6250– phone
(816) 300-6259 – fax
gab@georgebartonlaw.com
rob@georgebartonlaw.com

***ATTORNEYS FOR THE KANSAS AND NEVADA AUTO DEALERS***

## CERTIFICATE OF SERVICE

I hereby certify that on this 12 day of October, 2016 a true and correct copy of the foregoing was served to all parties and counsel of record via the Court's electronic filing system.

14

*s/ Robert G. Harken*
Robert G. Harken

## **INDEX OF EXHIBITS**

Exhibit 1 – ICLC's Allocation of Percentages to Each State

Exhibit 2 – Notice of Second Wave of Class Settlements

Exhibit 3 – Harken Affidavit

**EXHIBIT 1**

| State | Population, 2007 (in thousands)[1] | Cars per 1,000 people[2] | Total Number of Cars | Percent of Total | Money allocated | Total Referral Fees Due |
|---|---|---|---|---|---|---|
| Arizona | 6,339 | 660 | 4,183,578 | 3.0% | $55,959.38 | |
| Arkansas | 2,835 | 700 | 1,984,358 | 1.4% | $26,542.70 | |
| California | 36,553 | 840 | 30,704,701 | 22.2% | $410,704.90 | |
| District of Colum | 588 | 350 | 205,902 | 0.1% | $2,754.14 | |
| Florida | 18,251 | 710 | 12,958,383 | 9.4% | $173,330.83 | |
| Hawaii | 1,283 | 760 | 975,375 | 0.7% | $13,046.58 | |
| Illinois | 12,853 | 750 | 9,639,411 | 7.0% | $128,936.39 | |
| Iowa | 2,988 | 1,050 | 3,137,448 | 2.3% | $41,966.39 | $41,966.39 |
| Kansas | 2,776 | 830 | 2,304,078 | 1.7% | $30,819.25 | $30,819.25 |
| Maine | 1,317 | 780 | 1,027,421 | 0.7% | $13,742.75 | |
| Massachusetts | 6,450 | 820 | 5,288,799 | 3.8% | $70,742.77 | $70,742.77 |
| Michigan | 10,072 | 870 | 8,762,485 | 6.3% | $117,206.67 | $117,206.67 |
| Minnesota | 5,198 | 870 | 4,521,930 | 3.3% | $60,485.17 | $60,485.17 |
| Mississippi | 2,919 | 680 | 1,984,774 | 1.4% | $26,548.26 | |
| Missouri | 5,878 | 830 | 4,879,084 | 3.5% | $65,262.45 | |
| Montana | 958 | 1,120 | 1,072,804 | 0.8% | $14,349.79 | |
| Nebraska | 1,775 | 1,000 | 1,774,571 | 1.3% | $23,736.59 | $23,736.59 |
| Nevada | 2,565 | 500 | 1,282,691 | 0.9% | $17,157.23 | $17,157.23 |
| New Hampshire | 1,316 | 830 | 1,092,137 | 0.8% | $14,608.39 | $14,608.39 |
| New Mexico | 1,970 | 770 | 1,516,835 | 1.1% | $20,289.12 | $20,289.12 |
| New York | 19,298 | 570 | 10,999,706 | 8.0% | $147,131.64 | $147,131.64 |
| North Carolina | 9,061 | 670 | 6,070,891 | 4.4% | $81,204.01 | $40,602.01 |
| North Dakota | 640 | 1,080 | 690,892 | 0.5% | $9,241.35 | |
| Oregon | 3,747 | 770 | 2,885,540 | 2.1% | $38,596.88 | $38,596.88 |
| South Carolina | 4,408 | 770 | 3,393,936 | 2.5% | $45,397.16 | $45,397.16 |
| South Dakota | 796 | 950 | 756,403 | 0.5% | $10,117.62 | |
| Tennessee | 6,157 | 840 | 5,171,644 | 3.7% | $69,175.71 | $34,587.86 |
| Utah | 2,645 | 870 | 2,301,437 | 1.7% | $30,783.93 | $30,783.93 |
| Vermont | 621 | 910 | 565,341 | 0.4% | $7,561.98 | $7,561.98 |
| West Virginia | 1,812 | 750 | 1,359,026 | 1.0% | $18,178.28 | $18,178.28 |
| Wisconsin | 5,602 | 860 | 4,817,410 | 3.5% | $64,437.50 | $64,437.50 |
| Total: | 179,670 | | 138,308,993 | 100.0% | $1,850,015.80 | $824,288.81 |

[1]source: https://www.census.gov/popest/data/historical/2000s/vintage_2007/state.html

[2]source: https://en.wikipedia.org/wiki/List_of_U.S._states_by_vehicles_per_capita

**EXHIBIT 2**

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

*In re Automotive Parts Antitrust Litigation*, No. 12-md-02311
**If You Are an Automobile Dealership that Purchased New Vehicles or Bought Certain Parts**
**for a Vehicle in the U.S. Since 1998**
**You Could Receive Money From Settlements of Class Actions**

*A Federal Court authorized this Notice. This is not a solicitation from a lawyer.*

- Your legal rights are affected whether you act or don't act. Read this Notice carefully.

- Lawsuits involving the prices of certain vehicle component parts have been settled with certain Defendants in various class actions in this litigation ("Settling Defendants"). The Settling Defendants are identified below.

- You can make a claim for money benefits if you are an automobile dealership that indirectly purchased certain component parts and/or purchased new vehicles containing these parts ("Dealers") in the District of Columbia or one or more of the following states: Arizona, Arkansas, California, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

- This is the **second group** of settlements ("Settlements") that provide benefits to eligible Dealers.

- The Settlements and Settling Defendants involved in this Notice are:

  o DENSO Corporation, DENSO International America, Inc., DENSO International Korea Corporation, DENSO Korea Automotive Corporation, DENSO Automotive Deutschland GmbH, ASMO Co., Ltd., ASMO North America, LLC, ASMO Greenville of North Carolina, Inc., and ASMO Manufacturing, Inc. (together, "DENSO") have paid $61,200,000.00 to settle claims of eligible Dealers, allocated as follows:

    (1) $4,588,989.78 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Automotive Wire Harness Systems as a component part, or indirectly purchased one or more Automotive Wire Harness Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

    (2) $2,376,556.40 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Instrument Panel Clusters as a component part, or indirectly purchased one or more Instrument Panel Clusters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

    (3) $59,312.42 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Fuel Senders as a component part, or indirectly purchased one or more Fuel Senders as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

    (4) $4,634,740.67 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Heater Control Panels as a component part, or indirectly purchased one or more Heater Control Panels as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

    (5) $15,931,345.61 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Alternators as a component part, or indirectly purchased one or more Alternators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

    (6) $1,045,295.54 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more

Windshield Wiper Systems as a component part, or indirectly purchased one or more Windshield Wiper Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(7) $4,977,154.44 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Radiators as a component part, or indirectly purchased one or more Radiators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(8) $3,066,072.02 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Starters as a component part, or indirectly purchased one or more Starters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(9) $5,288,470.65 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Ignition Coils as a component part, or indirectly purchased one or more Ignition Coils as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(10) $44,880.00 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Motor Generators as a component part, or indirectly purchased one or more Motor Generators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(11) $449,937.81 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more HID Ballasts as a component part, or indirectly purchased one or more HID Ballasts as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(12) $44,880.00 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Inverters as a component part, or indirectly purchased one or more Inverters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(13) $44,880.00 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Fan Motors as a component part, or indirectly purchased one or more Fan Motors as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(14) $6,123,994.82 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Fuel Injection Systems (which include Air Flow Meters and Electronic Throttle Bodies) as a component part, or indirectly purchased one or more Fuel Injection Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(15) $44,880.00 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Power Window Motors as a component part, or indirectly purchased one or more Power Window Motors as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(16) $525,139.87 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more

Automatic Transmission Fluid Warmers and Oil Coolers as a component part, or indirectly purchased one or more Automatic Transmission Fluid Warmers and Oil Coolers as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(17) $1,377,485.94 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Valve Timing Control Devices as a component part, or indirectly purchased one or more Valve Timing Control Devices as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(18) $6,895,621.02 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Air Conditioning Systems as a component part, or indirectly purchased one or more Air Conditioning Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(19) $114,624.79 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Windshield Washer Systems as a component part, or indirectly purchased one or more Windshield Washer Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(20) $3,082,220.81 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Spark Plugs, Oxygen Sensors or Air Fuel Ratio Sensors as a component part, or indirectly purchased one or more Spark Plugs, Oxygen Sensors, or Air Fuel Ratio Sensors as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant; and

(21) $483,517.41 to settle claims of eligible Dealers that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Ceramic Substrates as a component part, or indirectly purchased one or more Ceramic Substrates as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

o Furukawa Electric Co., Ltd. and American Furukawa, Inc. (together, "Furukawa") have paid $13,440,000.00 to settle claims of eligible Dealers that, from January 1, 1998, through August 5, 2016: (a) purchased a new Vehicle that included one or more Automotive Wire Harness Systems as a component part, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant, or any co-conspirator of a Defendant, or (b) indirectly purchased one or more Automotive Wire Harness Systems, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant or any co-conspirator of a Defendant.

o LEONI Wiring Systems, Inc. and Leonische Holding Inc. (together, "LEONI") have paid $468,000.00 to settle claims of eligible Dealers that, from January 1, 1999 through June 28, 2016, (a) indirectly purchased Automotive Wire Harness System(s) manufactured or sold by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased a new automobile, van, sports utility vehicle, crossover, or pick-up truck in the United States which included one or more Automotive Wire Harness System(s) manufactured or sold by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator.

o Mitsubishi Electric Corporation, Mitsubishi Electric US Holdings, Inc., Mitsubishi Electric Automotive America, Inc. (together, "MELCO") have paid $20,282,927.00 to settle claims of eligible Dealers, allocated as follows:

(1) $5,409,456.63 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more Alternators

3

as a component part, or indirectly purchased one or more Alternators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(2) $5,202,570.78 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more Starters as a component part, or indirectly purchased one or more Starters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(3) $4,600,167.84 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more Ignition Coils as a component part, or indirectly purchased one or more Ignition Coils as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(4) $1,014,146.35 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more Fuel Injection Systems as a component part, or indirectly purchased one or more Fuel Injection Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(5) $1,014,146.35 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more Valve Timing Control Devices as a component part, or indirectly purchased one or more Valve Timing Control Devices as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(6) $1,014,146.35 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more Automotive Wire Harness Systems as a component part, or indirectly purchased one or more Automotive Wire Harness Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant;

(7) $1,014,146.35 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more HID Ballasts as a component part, or indirectly purchased one or more HID Ballasts as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant; and

(8) $1,014,146.35 to settle claims of eligible Dealers that, from July 1, 1998 to July 22, 2016, purchased a new vehicle in the United States that included one or more Electronic Powered Steering Assemblies as a component part, or indirectly purchased one or more Electronic Powered Steering Assemblies as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

o NSK Ltd., NSK Americas, Inc., NSK Steering Systems Co., Ltd. and NSK Steering Systems America, Inc. (together, "NSK") have paid $8,280,000.00 to settle claims of eligible Dealers, allocated as follows:

(1) $7,080,000.00 to settle claims of eligible Dealers that, from and including January 1, 2000 through July 21, 2016, indirectly (a) purchased Bearings manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased new vehicles containing Bearings manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator; and

(2) $1,200,000.00 to settle claims of eligible Dealers that, from and including January 1, 2000 through July 21, 2016, indirectly (a) purchased Electronic Powered Steering Assemblies manufactured or sold by a Defendant, or any current or former subsidiary or

affiliate thereof or any co-conspirator, or (b) purchased new vehicles containing Electronic Powered Steering Assemblies manufactured or sold by a Defendant or any current or former subsidiary, affiliate thereof or co-conspirator.

o Omron Automotive Electronics Co. Ltd. ("Omron") has paid $960,000.00 to settle claims of eligible Dealers that, from January 1, 2003 through August 10, 2016, purchased for resale a new Honda Vehicle in the United States that included one or more Power Window Switches as a component part or indirectly purchased one or more Power Window Switches as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

o Schaeffler Group USA Inc. ("Schaeffler") has paid $2,400,000.00 to settle claims of eligible Dealers that, from January 1, 2000, through August 10, 2016: (1) purchased new Vehicles that included one or more Automotive Bearings as a component part, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant, or any co-conspirator of the Defendants, or (2) indirectly purchased one or more Automotive Bearings, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant or any co-conspirator of the Defendants.

o Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., and Sumitomo Wiring Systems (U.S.A.) (together, "Sumitomo") have paid $12,000,000.00 to settle claims of eligible Dealers, allocated as follows:

(1) $11,310,700.00 to settle claims of eligible Dealers that, from January 1, 1999 to September 15, 2015, purchased a new vehicle in the United States for resale, which included one or more Automotive Wire Harness System(s) as a component part, or indirectly purchased one or more Automotive Wire Harness System(s) as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants; and

(2) $689,300.00 to settle claims of eligible Dealers that, from January 1, 1999 through September 15, 2015, purchased a new vehicle in the United States for resale, which included one or more Heater Control Panel(s) as a component part, or indirectly purchased one or more Heater Control Panel(s) as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants.

o Sumitomo Riko Co. Ltd, DTR Industries, Inc., and Tokai Rubber Industries, Ltd. (together, "Sumitomo Riko") have paid $3,600,000.00 to settle claims of eligible Dealers, allocated as follows:

(1) $3,247,560.00 to settle claims of eligible Dealers that, from June 1, 1996, through August 1, 2016, purchased a new Vehicle in the United States for resale that included one or more Anti-Vibration Rubber Parts as a component part, or indirectly purchased one or more Anti-Vibration Rubber Parts as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant; and

(2) $352,440.00 to settle claims of eligible Dealers that, from June 1, 2003, through August 1, 2016, purchased a new Vehicle in the United States for resale that included one or more Automotive Hoses as a component part, or indirectly purchased one or more Automotive Hoses as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

o Valeo Japan Co., Ltd., on behalf of itself and Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp. (together, "Valeo") has paid $2,100,000.00 to settle claims of eligible Dealers that, from May 1, 1999, through July 26, 2016, purchased a new Vehicle in the United States that included one or more Air Conditioning Systems as a component part, or indirectly purchased one or more Air Conditioning Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

• The Settling Defendants and certain affiliates have also agreed to provide certain cooperation in the cases against the remaining Defendants.

- The final judgments and/or settlement agreements with respect to certain of the Settling Defendants will provide for additional non-monetary relief in the form of an injunction against these Settling Defendants (including certain affiliates of certain Settling Defendants) not to engage in certain conduct with respect to the identified parts for certain periods from the date of entry of the final judgment. The terms of this additional injunctive relief are contained in the proposed final judgments and/or settlement agreements relating to these Settling Defendants, and may be viewed at the Settlement Website, www.AutoDealerSettlement.com.

- The Settling Defendants deny that they are liable and have asserted a number of defenses to the Dealers' claims but have settled to avoid the cost and risk of trials.

- If you are a Dealer as defined in this Notice and are a member of one or more of the Classes described in this Notice, the Settlements will affect the rights of your dealership.

| YOUR LEGAL RIGHTS AND OPTIONS IN THESE SETTLEMENTS | |
|---|---|
| **RELY ON PRIOR PROOF OF CLAIM TO PARTICIPATE IN THE SETTLEMENTS** | **To remain in the Settlement Classes, you do not need to take any further action at this time. If your dealership filed a valid Proof of Claim in the first round of dealership settlements in this litigation, you may rely on that Proof of Claim and do nothing further to participate in the current settlements.** If you choose this option, the information you provided in the prior Proof of Claim will be used to determine your dealership's share in the net proceeds of the current proposed Settlements (if your prior Proof of Claim was timely, valid, and your dealership is entitled to a distribution under the Plans of Allocation (described below in response to Question No. 9)) and if and to the extent that the proposed Settlements are approved by the Court. Your dealership will be bound by the judgment and release to be entered by the Court as described below (the "Judgment"). Your dealership may also update the information it provided through the prior Proof of Claim by submitting an updated Proof of Claim form that must be postmarked or submitted electronically, by April 28, 2017. |
| **FILE A PROOF OF CLAIM BY APRIL 28, 2017 TO PARTICIPATE IN THE SETTLEMENTS** | **To remain in the Settlement Classes, you do not need to take any further action at this time. However, to share in the Settlement Funds, and only if your dealership did not submit a Proof of Claim form in the prior dealership settlements in this litigation (for more information see Question 8, below), your dealership must submit a Proof of Claim form that is available on the Settlement Website at www.AutoDealerSettlement.com, and submit it by April 28, 2017.** If you choose this option, your dealership will share in the net proceeds of the proposed Settlements if its Proof of Claim is timely, valid, and your dealership is entitled to a distribution under the Plans of Allocation (described below in response to Question No. 9) and if and to the extent that the proposed Settlements are approved by the Court. Your dealership will be bound by the judgment and release to be entered by the Court as described below (the "Judgment"). To be valid, your dealership's request must contain the information required by the Proof of Claim form and be postmarked, or submitted electronically, by April 28, 2017. |
| **EXCLUDE YOUR DEALERSHIP FROM THE SETTLEMENTS BY OCTOBER 28, 2016** | If your dealership does not want to be included in one or more of the Settlements Classes, it may request to be excluded. If your dealership timely submits a valid request for exclusion, it will not share in the Settlement Funds from the corresponding Settlement(s), and it will not be bound by the corresponding Judgment(s). It will then be your dealership's responsibility to pursue any of the claims that it preserves by opting out of one or more of the Settlement Classes. To be valid, the request for exclusion must contain the information set forth in response to Question 11 below and be postmarked by October 28, 2016. |
| **OBJECT TO THE SETTLEMENTS BY OCTOBER 28, 2016** | If your dealership wishes to object to one or more of the Settlements or the request for fees, expenses, and service awards, it may (as discussed below) write to the Court and counsel about why it objects. It is possible that the Settlements and request for fees, expenses, and service awards will be approved despite your objection. To be considered, your dealership's objection must be made according to the procedures set forth in response to Question 16 below and be postmarked by October 28, 2016. |

| **ATTEND THE FINAL APPROVAL HEARING TO BE HELD ON NOVEMBER 16, 2016** | The Court will hold a hearing to decide whether to approve the Settlements and the request for attorney's fees, expenses, and service awards. You may attend and ask the Court's permission to speak, but you don't have to participate in the hearing in order to attend. To request to speak at the Final Approval Hearing, you must follow the procedures set forth in response to Question 20 below and submit a request to speak that must be postmarked by November 16, 2016. |

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

- The Court still has to decide whether to approve the Settlements. Payments will be made only if the Court approves the Settlements and that approval is upheld in the event of any appeal.

## WHAT THIS NOTICE CONTAINS

BASIC INFORMATION ........................................................................................................................................4
1. WHY IS THERE A NOTICE? ...................................................................................................................4
2. WHAT ARE THESE LAWSUITS ABOUT? ...........................................................................................5
3. WHY ARE THESE CASES CLASS ACTIONS? ....................................................................................5
4. WHY ARE THERE PROPOSED SETTLEMENTS? ...............................................................................5
5. HOW DO I KNOW WHETHER MY DEALERSHIP IS PART OF THE SETTLEMENTS? ..................6
6. I'M STILL NOT SURE IF MY DEALERSHIP IS INCLUDED ..............................................................9

THE SETTLEMENT BENEFITS--WHAT YOUR DEALERSHIP GETS ..........................................................9
7. WHAT DO THE SETTLEMENTS PROVIDE? ......................................................................................9
8. HOW MAY MY DEALERSHIP RECEIVE A PAYMENT? .................................................................11
9. HOW MUCH WILL MY PAYMENT BE? ...........................................................................................11
10. WHAT IS MY DEALERSHIP GIVING UP TO STAY IN THE SETTLEMENT CLASSES? .............11

EXCLUDING YOUR DEALERSHIP FROM THE SETTLEMENTS ...............................................................12
11. HOW DO I GET MY DEALERSHIP OUT OF THE SETTLEMENTS? ..............................................12
12. CAN MY DEALERSHIP REMAIN IN THE SETTLEMENT FOR SOME DEFENDANTS AND EXCLUDE ITSELF FROM OTHERS? .....................................................................................................................13
13. IF I EXCLUDE MY DEALERSHIP, CAN IT GET MONEY FROM THE SETTLEMENTS? ...................13

THE LAWYERS REPRESENTING AUTO DEALERS ....................................................................................13
14. DOES MY DEALERSHIP HAVE A LAWYER IN THESE CASES? ...................................................13
15. HOW WILL THE LAWYERS BE PAID? .............................................................................................13

OBJECTING TO THE SETTLEMENTS OR THE REQUESTS FOR ATTORNEY'S FEES, EXPENSES, AND SERVICE AWARDS ..........................................................................13
16. HOW DOES MY DEALERSHIP COMMENT ON OR OBJECT TO THE SETTLEMENTS? ..............13
17. WHAT'S THE DIFFERENCE BETWEEN OBJECTING AND EXCLUDING? ...................................14

THE FINAL APPROVAL HEARING ...............................................................................................................14
18. WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENTS? ............................................................................................................14
19. DO I HAVE TO COME TO THE HEARING? ......................................................................................15
20. MAY I SPEAK AT THE HEARING? ...................................................................................................15

IF YOUR DEALERSHIP DOES NOTHING ....................................................................................................15
21. WHAT HAPPENS IF MY DEALERSHIP DOES NOTHING? ............................................................15

GETTING MORE INFORMATION .................................................................................................................15
22. ARE THERE MORE DETAILS ABOUT THE SETTLEMENTS AND THE REQUEST FOR ATTORNEY'S FEES, EXPENSES, AND SERVICE AWARDS? ...................................................15
23. HOW DO I GET MORE INFORMATION? ..........................................................................................16
24. CAN I UPDATE MY DEALERSHIP'S ADDRESS? ...........................................................................16

## BASIC INFORMATION

### 1. WHY IS THERE A NOTICE?

This Notice informs you about the partial Settlements reached in some of the cases that are included in this litigation. The Settlements may benefit Dealers who, during the relevant time periods, purchased a new vehicle containing, or purchased one or more of the following parts: Air Conditioning Systems, Alternators, Anti-Vibration Rubber Parts, Automatic Transmission Fluid Warmers and Oil Coolers, Automotive Hoses, Bearings, Ceramic Substrates, Electronic Powered Steering Assemblies, Fan Motors, Fuel Injection Systems (including Air Flow Meters and Electronic Throttle bodies sold by DENSO), Fuel Senders, Heater Control Panels, HID Ballasts, Ignition Coils, Instrument Panel Clusters, Inverters, Motor Generators, Power

Window Motors, Power Window Switches, Radiators, Spark Plugs (including Oxygen Sensors and Air Fuel Ratio Sensors), Starters, Valve Timing Control Devices, Windshield Washer Systems, Windshield Wiper Systems and Wire Harness Systems manufactured by one or more of the Settling Defendants and/or their predecessors, subsidiaries and affiliates or those alleged to be their co-conspirators. For more information about these parts, you may review the settlement agreements at www.AutoDealerSettlement.com.

The term "Dealer" or "Automobile Dealer" means an entity or person authorized to engage in the business of selling and / or leasing new vehicles at retail in the United States. You may also have been transferred or acquired claims that would otherwise be released as part of the Settlements. **Most Dealers in the states set out in Question 2 below and the District of Columbia are eligible to make a claim for monetary benefits in addition to the non-monetary benefits that are available nationwide.**

The Court sent your dealership this Notice because, as a possible Class Member, your dealership has a right to know about the Settlements and about its options, before the Court decides whether to finally approve the Settlements. This Notice explains the lawsuits, the Settlements, and your dealership's legal rights.

The Court in charge is the United States District Court for the Eastern District of Michigan, and the litigation relates to separate class actions within the lead case known as *In re Automotive Parts Antitrust Litigation*, 12-md-02311. The Dealers who sued are called the "Plaintiffs" or the "Dealership Plaintiffs." The companies they sued in these cases are called the "Defendants." As described above, settlements have been reached with the "Settling Defendants."

## 2. WHAT ARE THESE LAWSUITS ABOUT?

The separate lawsuits claim that the Defendants in each lawsuit conspired to fix, maintain, and artificially raise the price of component parts at issue in each lawsuit. The lawsuits claim that, as a result of the relevant Defendants' conduct, Dealers paid more than they should have for the parts at issue in that lawsuit and paid more for the new vehicles in which those parts are contained. The lawsuits also allege that Dealers were unable to pass on all of these increased costs to their customers. These cases are proceeding as class actions for monetary recovery for Dealers in the District of Columbia and one or more of the following states: Arizona, Arkansas, California, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Included States"). The lawsuits also seek nationwide injunctive relief.

The Settling Defendants and their relevant affiliates deny these claims and have asserted various defenses. The Court has not yet decided who is right.

As noted above, the Settling Defendants are: DENSO, Furukawa, LEONI, MELCO, NSK, Omron, Schaeffler, Sumitomo, Sumitomo Riko, and Valeo. There are other Defendants who have not settled. This is the second group of Settlements preliminarily approved by the Court in the actions brought by the Dealership Plaintiffs on behalf of themselves and other Dealers. The cases continue against the other Defendants who have not settled ("Non-Settling Defendants).

## 3. WHY ARE THESE CASES CLASS ACTIONS?

In class actions, one or more individuals or companies called "Class Representatives" sue on behalf of themselves and others with similar claims. All of these individuals or companies together are the "Class" or "Class Members." One court resolves the issues for all Class Members, except for those who exclude themselves from the Class. United States District Judge Marianne O. Battani is in charge of these class actions.

## 4. WHY ARE THERE PROPOSED SETTLEMENTS?

All parties in litigation face an uncertain outcome. The continuation of the cases against the Settling Defendants could result in a judgment greater than these Settlements. However, continuing the cases could result in no recovery or in a recovery that is less than the Settlements. The Settlements provide immediate benefit to the Class Members, and will avoid the delays that could occur in the event of contested trials and appeals. Based on these factors, the Dealer Class Representatives and their attorneys have concluded that the Settlements are in the best interests of the Class Members.

The cases are proceeding against the Non-Settling Defendants. Additional money may become available as a result of a trial or future settlements. Alternatively, the cases may be resolved in favor of the Non-Settling Defendants and no additional money may become available. There is no guarantee about what will happen.

### 5. HOW DO I KNOW WHETHER MY DEALERSHIP IS PART OF THE SETTLEMENTS?

Your dealership is part of one or more of the Settlements if it is a Dealer and falls within the definition of one or more of the Settlement Classes approved by Judge Marianne O. Battani. The Settlement Class definitions are set forth below. For the purposes of only this Paragraph 5, the term "Defendants" as used below shall be as defined in the applicable settlement agreements:

(A) The DENSO Automotive Wire Harness Systems Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Automotive Wire Harness Systems as a component part, or indirectly purchased one or more Automotive Wire Harness Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(B) The DENSO Instrument Panel Clusters Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Instrument Panel Clusters as a component part, or indirectly purchased one or more Instrument Panel Clusters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(C) The DENSO Fuel Senders Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Fuel Senders as a component part, or indirectly purchased one or more Fuel Senders as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(D) The DENSO Heater Control Panels Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Heater Control Panels as a component part, or indirectly purchased one or more Heater Control Panels as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(E) The DENSO Alternators Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Alternators as a component part, or indirectly purchased one or more Alternators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(F) The DENSO Windshield Wiper Systems Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Windshield Wiper Systems as a component part, or indirectly purchased one or more Windshield Wiper Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(G) The DENSO Radiators Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Radiators as a component part, or indirectly purchased one or more Radiators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(H) The DENSO Starters Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Starters as a component part, or indirectly purchased one or more Starters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(I) The DENSO Ignition Coils Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Ignition Coils as a component part, or indirectly purchased one or more Ignition Coils as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(J) The DENSO Motor Generators Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Motor Generators as a component part, or indirectly purchased one or more Motor Generators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(K) The DENSO HID Ballasts Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more HID Ballasts as a component part, or indirectly purchased one or more HID Ballasts as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(L) The DENSO Inverters Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Inverters as a component part, or indirectly purchased one or more Inverters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(M) The DENSO Fan Motors Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Fan Motors as a component part, or indirectly purchased one or more Fan Motors as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(N) The DENSO Fuel Injection Systems Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Fuel Injection Systems (which include Air Flow Meters and Electronic Throttle Bodies) as a component part, or indirectly purchased one or more Fuel Injection Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(O) The DENSO Power Window Motors Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Power Window Motors as a component part, or indirectly purchased one or more Power Window Motors as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(P) The DENSO Automatic Transmission Fluid Warmers and Oil Coolers Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Automatic Transmission Fluid Warmers or Oil Coolers as a component part, or indirectly purchased one or more Automatic Transmission Fluid Warmers or Oil Coolers as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(Q) The DENSO Valve Timing Control Devices Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Valve Timing Control Devices as a component part, or indirectly purchased one or more Valve Timing Control Devices as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(R) The DENSO Air Conditioning Systems Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Air Conditioning Systems as a component part, or indirectly purchased one or more Air Conditioning Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(S) The DENSO Windshield Washer Systems Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Windshield Washer Systems as a component part, or indirectly purchased one or more Windshield Washer Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(T) The DENSO Spark Plugs, Oxygen Sensors, and Air Fuel Ratio Sensors Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Spark Plugs, Oxygen Sensors, or Air Fuel Ratio Sensors as a component part, or indirectly purchased one or more Spark Plugs, Oxygen Sensors, or Air Fuel Ratio Sensors as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(U) The DENSO Ceramic Substrates Settlement Class is defined as: All Automobile Dealerships that, from January 1, 1998 through July 14, 2016, purchased a new Vehicle in the United States that included one or more Ceramic Substrates as a component part, or indirectly purchased one or more Ceramic Substrates as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(V) The Furukawa Automotive Wire Harness Settlement Class is defined as: All automobile dealers that, during the period January 1, 1998, through August 5, 2016: (a) purchased a new Vehicle that included one or more Automotive Wire Harness Systems as a component part, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant, or any co-conspirator of a Defendant, or (b) indirectly purchased one or more Automotive Wire Harness Systems, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant or any co-conspirator of a Defendant.

(W)The LEONI Automotive Wire Harness Settlement Class is defined as: All automobile dealers that, from January 1, 1999, through June 28, 2016, (a) indirectly purchased Automotive Wire Harness System(s) manufactured or sold by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased a new automobile, van, sports utility vehicle, crossover, or pick-up truck in the United States which included one or more Automotive Wire Harness System(s) manufactured or sold by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator.

(X) The MELCO Alternators Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through July 22, 2016, purchased a new vehicle in the United States that included one or more Alternators as a component part, or indirectly purchased one or more Alternators as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(Y) The MELCO Starters Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through July 22, 2016, purchased a new vehicle in the United States that included one or more Starters as a component part, or indirectly purchased one or more Starters as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(Z) The MELCO Ignition Coils Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through July 22, 2016, purchased a new vehicle in the United States that included one or more Ignition Coils as a component part, or indirectly purchased one or more Ignition Coils as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(AA) The MELO Fuel Injection Systems Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through July 22, 2016, purchased a new vehicle in the United States that included one or more Fuel Injection Systems as a component part, or indirectly purchased one or more Fuel Injection Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(BB) The MELCO Valve Timing Control Devices Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through July 22, 2016, purchased a new vehicle in the United States that included one or more Valve Timing Control Devices as a component part, or indirectly purchased one or more Valve Timing Control Devices as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(CC) The MELCO Automotive Wire Harness Systems Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through July 22, 2016, purchased a new vehicle in the United States that included one or more Automotive Wire Harness Systems as a component part, or indirectly purchased one or more

Automotive Wire Harness Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(DD) The MELCO HID Ballasts Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through the March 30, 2016, purchased a new vehicle in the United States that included one or more HID Ballasts as a component part, or indirectly purchased one or more HID Ballasts as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(EE) The MELCO Electronic Powered Steering Assemblies Settlement Class is defined as: All automobile dealers that, from July 1, 1998 through March 30, 2016, purchased a new vehicle in the United States that included one or more Electronic Powered Steering Assemblies as a component part, or indirectly purchased one or more Electronic Powered Steering Assemblies as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(FF) The NSK Bearing Settlement Class is defined as: All Automobile Dealerships that, during the period from and including January 1, 2000 through July 21, 2016, indirectly (a) purchased Bearings manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased new vehicles containing Bearings manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

(GG) The NSK Electronic Powered Steering Assemblies Settlement Class is defined as: All Automobile Dealerships that, from and including January 1, 2000 through July 21, 2016, indirectly (a) purchased Electronic Powered Steering Assemblies manufactured or sold by a Defendant, or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased new vehicles containing Electronic Powered Steering Assemblies manufactured or sold by a Defendant or any current or former subsidiary, affiliate thereof or co-conspirator.

(HH) The Omron Power Window Switches Class is defined as: All Automobile Dealerships that, from January 1, 2003 through August 10, 2016 purchased for resale a new Honda Vehicle in the United States that included one or more Power Window Switches as a component part or indirectly purchased one or more Power Window Switches as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(II) The Schaeffler Bearings class is defined as: All automobile dealers that, during the period January 1, 2000, through August 10, 2016: (1) purchased new Vehicles that included one or more Automotive Bearings as a component part, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant, or any co-conspirator of the Defendants, or (2) indirectly purchased one or more Automotive Bearings, which were manufactured or sold by a Defendant, any current or former parent, subsidiary, or affiliate of a Defendant or any co-conspirator of the Defendants.

(JJ) The Sumitomo Automotive Wire Harness System Settlement Class is defined as: All automobile dealers that, from January 1, 1999 through September 15, 2015, purchased a new vehicle in the United States for resale, which included one or more Automotive Wire Harness System(s) as a component part, or indirectly purchased one or more Automotive Wire Harness System(s) as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants.

(KK) The Sumitomo HCP Settlement Class is defined as: All automobile dealers that, from January 1, 1999 through September 15, 2015, purchased a new vehicle in the United States for resale, which included one or more HCP(s) as a component part, or indirectly purchased one or more HCP(s) as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirators of the Defendants.

(LL) The Sumitomo Riko Anti-Vibrational Rubber Parts Settlement Class is defined as: All Automobile Dealerships that, during the period from June 1, 1996, through August 1, 2016, purchased a new Vehicle in the United States for resale that included one or more Anti-Vibration Rubber Parts as a component part, or indirectly purchased one or more Anti-Vibration Rubber Parts as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

12

(MM)The Sumitomo Riko Automotive Hoses Settlement Class is defined as: All Automobile Dealerships, from June 1, 2003, through August 1, 2016, purchased a new Vehicle in the United States for resale that included one or more Automotive Hoses as a component part, or indirectly purchased one or more Automotive Hoses as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

(NN) The Valeo Air Conditioning Systems Settlement Class is defined as: All automobile dealers who, from May 1, 1999, through July 26, 2016, purchased a new Vehicle in the United States that included one or more Air Conditioning Systems as a component part, or indirectly purchased one or more Air Conditioning Systems as a replacement part, which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant, or any co-conspirator of a Defendant.

A list of the Defendants and the alleged co-conspirators for each case involving the affected component parts described in the Settlement Class definitions above is available on the Settlement Website at www.AutoDealerSettlement.com. You may also call the Settlement Administrator toll free at 1-888-565-3171 for more information.

Dealers who indirectly purchased certain component parts and/or purchased new vehicles containing these component parts, listed in the Settlement Class definitions above, in one or more of the Included States (Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin) may receive money benefits from the Settlements. Dealers in the United States who indirectly purchased certain component parts and/or purchased new vehicles containing these component parts, listed in the Settlement Class definitions above, may receive other, non-monetary benefits from the Settlements as explained in further detail on the Settlement Website at www.AutoDealerSettlement.com.

If your dealership is a member of one or more of these Settlement Classes and purchased in an Included State, the amount of money it will receive, if any, will depend upon where the dealership purchased the affected vehicles or component parts and the Plans of Allocation discussed below.

### 6. I'M STILL NOT SURE IF MY DEALERSHIP IS INCLUDED.

Additional information to help you determine whether your dealership is a member of one or more of the Settlement Classes eligible to make a claim for money benefits is available on the Settlement Website at www.AutoDealerSettlement.com. You may also call the Settlement Administrator toll free at 1-888-565-3171 for more information.

## THE SETTLEMENT BENEFITS—WHAT YOUR DEALERSHIP GETS

### 7. WHAT DO THE SETTLEMENTS PROVIDE?

The settlement funds (the "Settlement Funds") for Dealers involved in this Notice total nearly $125 million. The Settlement Funds for the respective Settlements and affected component parts are:

| Auto Parts Settlements and Settlement Funds | | | |
|---|---|---|---|
| **Automotive Parts Case** | **Settling Defendant** | **Amount from Defendant** | **Settlement Fund** |
| Air Conditioning Systems | DENSO | $6,895,621.02 | $8,995,621.02 |
| | Valeo | $2,100,000.00 | |
| Alternators | MELCO | $5,409,456.63 | $21,340,802.24 |
| | DENSO | $15,931,345.61 | |
| Anti-Vibration Rubber Parts | Sumitomo Riko | $3,247,560.00 | $3,247,560.00 |
| Automatic Transmission Fluid Warmers and Oil Coolers | DENSO | $525,139.87 | $525,139.87 |
| Automotive Hoses | Sumitomo Riko | $352,440.00 | $352,440.00 |
| Bearings | NSK | $7,080,000.00 | $9,480,000.00 |
| | Schaeffler | $2,400,000.00 | |

| Ceramic Substrates | DENSO | $483,517.41 | $483,517.41 |
|---|---|---|---|
| Electronic Powered Steering Assemblies | MELCO | $1,014,146.35 | $2,214,146.35 |
| | NSK | $1,200,000.00 | |
| Fan Motors | DENSO | $44,880.00 | $44,880.00 |
| Fuel Injection Systems (includes Air Flow Meters and Electronic Throttle Bodies sold by DENSO) | MELCO | $1,014,146.35 | $7,138,141.17 |
| | DENSO | $6,123,994.82 | |
| Fuel Senders | DENSO | $59,312.42 | $59,312.42 |
| Heater Control Panels | Sumitomo | $689,300.00 | $5,324,040.67 |
| | DENSO | $4,634,740.67 | |
| HID Ballasts | MELCO | $1,014,146.35 | $1,464,084.16 |
| | DENSO | $449,937.81 | |
| Ignition Coils | MELCO | $4,600,167.84 | $9,888,638.49 |
| | DENSO | $5,288,470.65 | |
| Instrument Panel Clusters | DENSO | $2,376,556.40 | $2,376,556.40 |
| Inverters | DENSO | $44,880.00 | $44,880.00 |
| Motor Generators | DENSO | $44,880.00 | $44,880.00 |
| Power Window Motors | DENSO | $44,880.00 | $44,880.00 |
| Power Window Switches | Omron | $960,000.00 | $960,000.00 |
| Radiators | DENSO | $4,977,154.44 | $4,977,154.44 |
| Spark Plugs, Oxygen Sensors & Air Fuel Ratio Sensors | DENSO | $3,082,220.81 | $3,082,220.81 |
| Starters | DENSO MELCO | $3,066,072.02 $5,202,570.78 | $8,268,642.02 |
| Valve Timing Control Devices | MELCO | $1,014,146.35 | $2,391,632.29 |
| | DENSO | $1,377,485.94 | |
| Windshield Washer Systems | DENSO | $114,624.79 | $114,624.79 |
| Windshield Wiper Systems | DENSO | $1,045,295.54 | $1,045,295.54 |
| Wire Harness Systems | MELCO | $1,014,146.35 | $30,821,836.13 |
| | Sumitomo | $11,310,700.00 | |
| | DENSO | $4,588,989.78 | |
| | LEONI | $468,000.00 | |
| | Furukawa | $13,440,000.00 | |
| **Total** | | | **124,730,980** |

After deduction of attorney's fees, notice and claims administration costs, litigation expenses, and service awards to the Dealers who served as the Class Representatives, as approved by the Court, the net Settlement Funds will be distributed to Settlement Class Members eligible for monetary relief who file, or who previously filed, Proof of Claims that are allowed by the Settlement Administrator and the Court. The net Settlement Funds will be allocated to eligible members of the Settlement Classes according to Plans of Allocation that have been or will be approved by the Court.

Under all of the Settlements, the Settling Defendants will provide certain cooperation in the Dealers' continuing litigation against the Non-Settling Defendants. Some of the settlement agreements give the Settling Defendants the right to withdraw from their respective Settlements, or reduce their payments of Settlement Funds, in the event that certain percentages of Settlement Class Members elect to exclude themselves from the respective Settlement(s).

The final judgments and/or settlement agreements with respect to certain of the Settling Defendants will provide for additional non-monetary relief in the form of an injunction prohibiting these Settling Defendants (including certain affiliates of certain Settling Defendants) from engaging in certain conduct with respect to the identified parts for a period of two years from the date of entry of the final judgment. The terms of this additional non-monetary relief are contained in the proposed final judgments and/or settlement agreements relating to these Settling Defendants, and may be viewed at the Settlement Website, www.AutoDealerSettlement.com.

The Settlements provide for the release of claims against the Settling Defendants (including all related entities and products covered by the releases in the individual settlement agreements) for claims relating to alleged conduct identified in the settlement agreements. The settlement agreements describe in detail who is released and what claims and products are released, so read them carefully because those descriptions will be binding on you if you remain in one of the Settlement Class(es). If a Settlement is approved by the Court, all Settlement Class Members who do not timely submit a valid request for exclusion from the respective Settlement Class and anyone claiming through them shall be deemed to have given up any related claims against the released parties.

The above description of the Settlements is only a summary. The complete terms, including the definitions of what parties and claims are being released, are set forth in the settlement agreements and Court filings, which may be obtained at the Settlement Website, www.AutoDealerSettlement.com.

### 8. HOW MAY MY DEALERSHIP RECEIVE A PAYMENT?

If your dealership remains in one or more of the Settlement Classes and one or more of those Settlements become effective, your dealership may be entitled to a portion of the Settlement Funds when a distribution is made to members of the applicable Settlement Class(es) who purchased the affected parts as components in new vehicles or affected component parts in the Included States set out above. **If your dealership filed a valid Proof of Claim in the first round of settlements in this litigation, you may rely on that Proof of Claim and do nothing further to participate in the current settlements.** If you choose this option, the information you provided in the prior Proof of Claim will be used to determine your dealership's share in the net proceeds of the current proposed Settlements (if your prior Proof of Claim was timely, valid, and your dealership is entitled to a distribution under the Plans of Allocation (described below in response to Question No. 9)) and if and to the extent that the proposed Settlements are approved by the Court. Your dealership will be bound by the judgment and release to be entered by the Court as described below (the "Judgment"). Your dealership may also update the information provided through the prior Proof of Claim by submitting an updated Proof of Claim form that must be postmarked or submitted electronically, by April 28, 2017.

**If your dealership did not submit a Proof of Claim in the first round of dealership settlements in this litigation but wants to share in the current settlements, it must submit a Proof of Claim either electronically on the Settlement Website at www.AutoDealerSettlement.com by April 28, 2017, or by First Class Mail postmarked by the deadline of April 28, 2017 to:**

Auto Dealer Settlement Administrator
PO Box 40007
College Station, TX 77842-4007

If your dealership has submitted a valid Proof of Claim, it may then receive a distribution from the Settlements that are approved by the Court, and in which your dealership is a member of the Settlement Class.

The settlement agreements may be terminated for several reasons, including (1) if the Court does not approve, or materially modifies, the settlement agreements, (2) if the Court approves the settlement agreements but the approval is reversed or materially modified by an appellate court, or (3) by the parties under certain circumstances described in some of the settlement agreements. If the settlement agreements are terminated, the lawsuits will proceed as if the settlement agreements had not been entered into. There will be no payments under any settlement agreements that are terminated.

### 9. HOW MUCH WILL MY PAYMENT BE?

Your dealership's share (if any) of the Settlement Funds will be determined based upon the Plans of Allocation, which have been devised under the supervision of a special allocation consultant and which have been, or will be, approved by the Court. The Plans of Allocation are or will be made available on the Settlement Website, at www.AutoDealerSettlement.com. The Plans of Allocation allocate the net proceeds of each of the Settlements to: (1) Dealers who purchased vehicle models that were subject to alleged collusion on bids for components parts, (2) Dealers who purchased vehicles from manufacturers of vehicles allegedly affected by collusion on bids for component parts, (3) Dealers who purchased the allegedly affected component parts manufactured by the Settling Defendants and/or their predecessors, subsidiaries and affiliates or their alleged

15

co-conspirators, and (4) a reserve fund for future allocation and distribution to Settlement Class Members. Payments will take into account the number and type of vehicles and affected component parts your dealership purchased during the periods set forth in the Settlement Class definitions.

At this time, it is unknown how much money each Settlement Class Member who purchased new affected vehicles or any of the affected component parts in the Included States listed in Question 2 above will receive. It is expected that each Settlement Class Member who purchased new affected vehicles or any of the affected component parts in the Included States and who files a valid Proof of Claim will receive a minimum payment of $350.00 under these Settlements.

Certain portions of the Plans of Allocation may be considered at the Final Approval Hearing, along with the fairness of the Settlements, and applications for attorney's fees, reimbursement of partial and future expenses, and service awards. The Plans of Allocation may also be considered at later hearings before the Court, and notice of such hearings will be provided on the Settlement Website.

## 10. WHAT IS MY DEALERSHIP GIVING UP TO STAY IN THE SETTLEMENT CLASSES?

Unless your dealership excludes itself from a specific Settlement, it is staying in the corresponding Settlement Class(es), and that means that your dealership can't sue, continue to sue, or be part of any other lawsuit against that Settling Defendant (including all related entities covered by the releases in the individual settlement agreements) about the issues settled in these cases. This is called a release. It also means that all of the Court's orders will apply to and legally bind your dealership.

However, your dealership would not give up (a) any claim made with respect to any auto part that is not part of any Settlement or (b) any claim for negligence, certain breaches of contract, bailment, failure to deliver, lost goods, damaged or delayed goods, or a similar claim, or any other claim unrelated to the legal issues in these cases. The Settlements also do not affect the rights of the members of the Settlement Classes against any Non-Settling Defendant. Lawsuits brought on behalf of Dealers will continue against the Non-Settling Defendants.

The settlement agreements, which are available at www.AutoDealerSettlement.com, describe the exact legal claims and rights that your dealership gives up if it stays in one or more of the Settlement Classes.

If your dealership wants to keep the right to sue or continue to sue one or more of the Settling Defendants, on its own, about the legal issues in these cases, then your dealership must take steps to get out of the Settlement(s) with those Settling Defendant(s). This is called excluding yourself, or opting out of, the Class. If your dealership opts out of a Settlement, it will not get any payment from that Settlement.

## EXCLUDING YOUR DEALERSHIP FROM ANY OF THE SETTLEMENTS

## 11. HOW DO I GET MY DEALERSHIP OUT OF ONE OR MORE OF THE SETTLEMENTS?

If your dealership is a member of one or more of the Settlement Classes listed in Question 5 above and purchased new affected vehicles or any of the affected component parts in an Included State, you may opt-out or exclude your dealership from the Settlements. To exclude your dealership from one or more of the Settlements, your dealership must send a letter saying that it wants to opt out or be excluded from the relevant Settlement Class(es). The letter must include the following information:

- A statement indicating that your dealership wants to be excluded from one or more of the Settlement Classes.

- Whether it wants to be excluded from: the DENSO Settlement Classes (i.e, the DENSO Automotive Wire Harness Systems Settlement Class; the DENSO Instrument Panel Clusters Settlement Class; the DENSO Fuel Senders Settlement Class; the DENSO Heater Control Panels Settlement Class; the DENSO Alternators Settlement Class; the DENSO Windshield Wiper Systems Settlement Class; the DENSO Radiators Settlement Class; the DENSO Starters Settlement Class; the DENSO Ignition Coils Settlement Class; the DENSO Motor Generators Settlement Class; the DENSO HID Ballasts Settlement Class; the DENSO Inverters Settlement Class; the DENSO Fan Motors Settlement Class; the DENSO Fuel Injection Systems Settlement Class; the DENSO Power Window Motors Settlement Class; the DENSO Automatic Transmission Fluid Warmers and Oil Coolers Settlement Class; the DENSO Valve Timing Control Devices Settlement Class; the DENSO Air Conditioning Systems Settlement Class; the DENSO Windshield Washer Systems Settlement Class; the DENSO Spark Plugs, Oxygen Sensors, and Air Fuel Ratio Sensors Settlement Class; and the DENSO Ceramic Substrates Settlement Class); the Furukawa Automotive Wire Harness Systems Settlement Class; the LEONI Automotive Wire Harness System Settlement Class; the MELCO Settlement Classes (i.e., the MELCO Alternators Settlement Class; the MELCO Starters Settlement Class; the MELCO Ignition Coils Settlement Class; the MELCO Fuel Injection Systems Settlement Class; the MELCO Valve Timing Control Devices Settlement Class; the MELCO Automotive Wire Harness Systems Settlement Class; the MELCO HID Ballasts Settlement Class; and the MELCO Electronic Powered Steering Assemblies Settlement Class); the NSK Settlement

Classes (i.e., the NSK Bearings Settlement Class; and the NSK Electronic Powered Steering Assemblies Settlement Class); the Omron Power Window Switches Settlement Class; the Schaeffler Bearings Settlement Class; the Sumitomo Settlement Classes (i.e., the Sumitomo Automotive Wire Harness Systems Settlement Class, and the Sumitomo HCP Settlement Class); the Sumitomo Riko Settlement Classes (i.e., the Sumitomo Riko Anti-Vibration Rubber Parts Settlement Class; and the Sumitomo Riko Automotive Hoses Settlement Class); and / or the Valeo Air Conditioning Systems Settlement Class. Your dealership's request for exclusion may not be effective unless it specifies from which Settlement(s) it is seeking exclusion.

- The case name: *In re Automotive Parts Antitrust Litigation*.

- The name, address, telephone number, and signature of a person with the authority to bind the dealership in its decision to exclude itself from the Settlement(s).

- All trade names or business names and addresses the dealership has used as a new car dealership, as well as any subsidiaries or affiliates who are requesting to be excluded from the Settlement(s).

- Your dealership's dealer number(s) / dealer identification number(s) (for each car manufacturer for which you are or were an authorized dealer).

This letter must be postmarked by **October 28, 2016** and sent to:

Auto Dealer Settlement Exclusions<br>
PO Box 6002<br>
Larkspur, CA 94977-6002

**If your dealership asks to be excluded from any of the Settlements, it will not get any payment from any of the particular Settlements from which it excludes itself, and your dealership cannot object to those Settlements.**

Unless your dealership excludes itself, it gives up any right to sue the Settling Defendants (including all related entities covered by the releases in the individual settlement agreements) for the claims that the Settlements resolve. If your dealership has a pending lawsuit against a Settling Defendant (including all related entities covered by the releases in the individual settlement agreements) involving the same legal issues in this case, speak to your lawyer in that case immediately. (Your dealership must exclude itself from the corresponding Settlement Class(es) in order to continue its own lawsuit against one or more of the Settling Defendants (including all related entities covered by the releases in the individual settlement agreements) concerning the parts for which they have settled.)

## 12. CAN MY DEALERSHIP REMAIN IN THE SETTLEMENTS WITH SOME DEFENDANTS AND EXCLUDE ITSELF FROM OTHERS?

Yes. Because there are separate Settlements of separate lawsuits, your dealership will need to decide, for each of the Settlements, whether to exclude itself from the Settlement, or whether to remain in the corresponding Settlement Class(es).

## 13. IF I EXCLUDE MY DEALERSHIP, CAN IT GET MONEY FROM THE SETTLEMENTS?

No. If your dealership excludes itself from one or more Settlements, it will not be able to get money from those particular Settlements. If your dealership excludes itself from some, but not all, of the Settlements, it will be eligible to receive payment from the Settlements for which it remains in the corresponding Settlement Class(es).

### THE LAWYERS REPRESENTING AUTO DEALERS

## 14. DOES MY DEALERSHIP HAVE A LAWYER IN THESE CASES?

The Court has appointed the law firms of Cuneo Gilbert & LaDuca, LLP, Larson • King, LLP, and Barrett Law Group, P.A. as interim class counsel ("Class Counsel") in these lawsuits to represent your dealership and all other members of the Settlement Classes. The Barrett Law Group is not involved in the anti-vibration rubber parts cases. The Court also appointed Mantese Honigman, PC as Liaison Counsel for Dealers. Other law firms, including Thrash Law Firm, PA and Lovelace Law Firm, PA, are representing Dealers. Your dealership will not be charged directly by these lawyers, and any fees that they are paid will come from any settlements or recovery in these lawsuits. If your dealership wants to be represented by its own lawyer, it may hire one at its own expense.

## 15. HOW WILL THE LAWYERS BE PAID?

Your dealership is not personally responsible for payment of attorneys' fees or expenses for Class Counsel or the other attorneys that have worked on behalf of the Dealers in these cases. As compensation for their time and the risk in litigating

these cases on a contingent basis, Class Counsel will ask the Court to award attorneys' fees of up to one-third of the Settlement Funds and reimbursement of expenses they have already paid in representing Dealers in these lawsuits. Any payment to Class Counsel must be approved by the Court, the attorneys may request less than one-third of the Settlement Funds, and the Court may award less than the requested amount.

Class Counsel may also request service awards of up to $50,000.00 for the Dealers who have served as Class Representatives in these lawsuits to recognize them for the time, effort, and resources they have devoted to representing the Settlement Classes. If the Court grants this request, the service awards will be deducted proportionally from the Settlement Funds.

The fees, costs, expenses and awards that the Court orders, plus the cost to administer the Settlements, will come out of the Settlement Funds. Class Counsel will also seek permission to set aside up to eight percent of the Settlement Funds for future litigation expenses to be used in the continuing lawsuits against the Non-Settling Defendants. Any unused funds that remain after payment of attorneys' fees will revert to the Settlement Funds for payment to eligible Dealers. The motion requesting these awards will be considered at the Final Approval Hearing described in this Notice and will be posted on the Settlement Website, www.AutoDealerSettlement.com.

## OBJECTING TO THE SETTLEMENTS OR THE REQUESTS FOR ATTORNEY'S FEES, EXPENSES, AND SERVICE AWARDS

Your dealership can tell the Court that it doesn't agree with the Settlements or some parts of them, or with the request for attorney's fees, reimbursement of expenses, or service awards.

### 16. HOW DOES MY DEALERSHIP COMMENT ON OR OBJECT TO THE SETTLEMENTS?

Your dealership can object to any Settlement in which it is a member of the corresponding Settlement Class(es) as long as it has not excluded itself from the corresponding Settlement Class(es). Your dealership can object if it doesn't like any part of them, or if it disagrees with the request for attorney's fees, expenses, and service awards. The Court will consider your dealership's views.

To object, your dealership must send a letter that includes:

- Whether it wants to state an objection or make a comment in connection with:

  o the Settlement by DENSO of the claims in the Automotive Wire Harness Systems Action; the Instrument Panel Clusters Action; the Fuel Senders Action; the Heater Control Panels Action; the Alternators Action; the Windshield Wiper Systems Action; the Radiators Action; the Starters Action; the Ignition Coils Action; the Motor Generators Action; the HID Ballasts Action; the Inverters Action; the Fan Motors Action; the Fuel Injection Systems Action; the Power Window Motors Action; the Automatic Transmission Fluid Warmers and Oil Coolers Action; the Valve Timing Control Devices Action; the Air Conditioning Systems Action; the Windshield Washer Systems Action; the Spark Plugs, Oxygen Sensors, and Air Fuel Ratio Sensors Action; or the Ceramic Substrates Action;

  o the Settlement by Furukawa of the claims in the Automotive Wire Harness Systems Action;

  o the Settlement by LEONI of the claims in the Automotive Wire Harness System Action;

  o the Settlement by MELCO of the claims in the Alternators Action; the Starters Action; the Ignition Coils Action; the Fuel Injection Systems Action; the Valve Timing Control Devices Action; the Automotive Wire Harness Systems Action; the HID Ballasts Action; or the Electronic Powered Steering Assemblies Action;

  o the Settlement by NSK of the claims in the Bearings Action; or the Electronic Powered Steering Assemblies Action;

  o the Settlement by Omron of the claims in the Power Window Switches Action;

  o the Settlement by Schaeffler of the claims in the Bearings Action;

  o the Settlement by Sumitomo of the claims in the Automotive Wire Harness Systems Action; or the HCP Action;

  o the Settlement by Sumitomo Riko of the claims in the Anti-Vibration Rubber Parts Action; or the Automotive Hoses Action; or

  o the Settlement by Valeo of the claims in the Air Conditioning Systems Action.

- The case name: *In re Automotive Parts Antitrust Litigation*;

- The name, address, telephone number, and signature of a person with the authority to bind the dealership in its decision to object to the Settlement(s);

- All trade names or business names and addresses the dealership has used as a new car dealership, as well as any subsidiaries or affiliates who are objecting to the Settlement(s);

- Your dealership's dealer number(s) / dealer identification number(s) (for each car manufacturer for which you are or were an authorized dealer);

- Evidence that the objecting new car dealership is a member of one of the Settlement Classes;

- A full explanation of why your dealership objects to the Settlement(s) and which Settlement(s) it objects to;

- Whether you or an attorney representing your dealership intends to appear at the Final Approval Hearing; and

- Copies of any documents you wish to use, reference, or rely upon at the Final Approval Hearing.

Your dealership must file the objection with the Court at the following address, received by **October 28, 2016**:

Clerk's Office
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd., Room 564
Detroit, MI 48226

A copy of the objection must also be mailed to the following address, postmarked by **October 28, 2016**:

Auto Dealer Settlement Objections
PO Box 6002
Larkspur, CA 94977-6002

## 17. WHAT'S THE DIFFERENCE BETWEEN OBJECTING AND EXCLUDING?

Objecting is simply telling the Court that your dealership doesn't like something about the Settlements or the request for attorney's fees, reimbursement of expenses, or service awards. Your dealership can object to one or more of the Settlements only if it stays in the Settlement Class(es) for the particular Settlement. If your dealership excludes itself from a Settlement, it has no right to object because that Settlement no longer affects your dealership.

## THE FINAL APPROVAL HEARING

The Court will hold a hearing to decide whether to approve the Settlements, and the request for attorney's fees, expenses, and service awards. You may attend and ask the Court's permission to speak, but you don't have to participate in the hearing in order to attend.

## 18. WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENTS?

The Court will hold the Final Approval Hearing at 1:30 p.m. on November 16, 2016, at the United States District Court for the Eastern District of Michigan, Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd., Courtroom 272, Detroit, MI 48226. At that hearing, the Court will consider whether each of the Settlements is fair, reasonable, and adequate, and whether to award attorney's fees, reimbursement of expenses, and service awards. The Court may also consider whether certain of the Plans of Allocation are fair and reasonable. If there are objections, the Court will consider them. We do not know how long these decisions will take or whether appeals will be filed.

The Court may change the time and date of the Final Approval Hearing. Notice of any change will be posted at www.AutoDealerSettlement.com.

## 19. DO I HAVE TO COME TO THE HEARING?

No, but you are welcome to come at your own expense. If your dealership files an objection, you do not have to come to Court to talk about it. As long as you mailed your dealership's written objection on time, it will be before the Court when the Court considers whether to approve the Settlements. Your dealership also may pay its own lawyer to attend the Final Approval Hearing, but such attendance is not necessary.

## 20. MAY I SPEAK AT THE HEARING?

You, or a lawyer representing your dealership, may ask the Court for permission to speak at the Final Approval Hearing. If you wish to do so, you or the lawyer representing your dealership must send a letter stating the following:

- "Notice of Intention to Appear in *In re Automotive Parts Antitrust Litigation*";

- Which of the settlements identified in Question 5 you are seeking to address at the hearing;

**EXHIBIT 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS | : | Master File No.  12-md-02311 |
| ANTITRUST LITIGATION | : | Honorable Marianne O. Battani |
| | : | |
| In Re:  Wire Harness | : | Case No. 2:12-cv-00102 |
| In Re:  Instrument Panel Clusters | : | Case No. 2:12-cv-00202 |
| In Re:  Fuel Senders | : | Case No. 2:12-cv-00302 |
| In Re:  Heater Control Panels | : | Case No. 2:12-cv-00402 |
| In Re:  Bearings | : | Case No. 2:12-cv-00502 |
| In Re:  Alternators | : | Case No. 2:13-cv-00702 |
| In Re:  Anti Vibrational Rubber Parts | : | Case No. 2:13-cv-00802 |
| In Re:  Windshield Wiper Systems | : | Case No. 2:13-cv-00902 |
| In Re:  Radiators | : | Case No. 2:13-cv-01002 |
| In Re:  Starters | : | Case No. 2:13-cv-01102 |
| In Re:  Ignition Coils | : | Case No. 2:13-cv-01402 |
| In Re:  Motor Generators | : | Case No. 2:13-cv-01502 |
| In Re:  HID Ballasts | : | Case No. 2:13-cv-01702 |
| In Re:  Inverters | | Case No. 2:13-cv-01802 |
| In Re:  Electronic Powered Steering Assemblies | | Case No. 2:13-cv-01902 |
| In Re:  Air Flow Meters | | Case No. 2:13-cv-02002 |
| In Re:  Fan Motors | | Case No. 2:13-cv-02102 |
| In Re:  Fuel Injection Systems | | Case No. 2:13-cv-02202 |
| In Re:  Power Window Motors | | Case No. 2:13-cv-02302 |
| In Re:  Automatic Transmission Fluid Warmers | | Case No. 2:13-cv-02402 |
| In Re:  Valve Timing Control Devices | | Case No. 2:13-cv-02502 |
| In Re:  Electronic Throttle Bodies | | Case No. 2:13-cv-02602 |
| In Re:  Air Conditioning Systems | | Case No. 2:13-cv-02702 |
| In Re:  Windshield Washer Systems | | Case No. 2:13-cv-02802 |
| In Re:  Spark Plugs | | Case No. 2:15-cv-03002 |
| In Re:  Automotive Hoses | | Case No. 2:15-cv-12893 |
| In Re:  Power Window Switches | | Case No. 2:16-cv-03902 |
| In Re:  Ceramic Substrates | | Case No. 2:16-cv-12194 |

THIS DOCUMENT RELATES TO
AUTOMOBILE DEALERSHIP ACTIONS

**AFFIDAVIT OF ROBERT G. HARKEN IN SUPPORT OF LAW OFFICES OF
GEORGE A. BARTON, P.C.'S MOTION FOR AN AWARD OF ATTORNEYS' FEES
RELATED TO ITS REPRESENTATION OF
THE KANSAS AND NEVADA AUTO DEALER PLAINTIFFS**

State of Kansas          )
                         ) ss.
County of Johnson        )

     I, Robert G. Harken, being duly sworn state as follows:

     1.     I am an attorney at the Law Offices of George A. Barton, P.C. ("the Barton Law Firm") and submit this affidavit in support of the Barton Law Firm's Motion for an Award of Attorneys' Fees Related to its Representation of the Kansas and Nevada Auto Dealer Plaintiffs. I have personal knowledge of the facts set forth in this affidavit, and to the best of my knowledge and belief, the statements set forth in this affidavit are true and accurate. The Barton Law Firm is a law firm which currently employs four full time attorneys, two paralegals, and a law clerk. Each of the firm's four attorneys specializes in representing plaintiffs in complex business litigation, including class actions.

     2.     In early 2012, Mr. Don Barrett, Interim Co-Lead Counsel ("ICLC") for the Auto Dealer Plaintiffs, contacted the Barton Law Firm to discuss the Barton Law Firm's involvement in this class action multidistrict litigation ("MDL") and whether the Barton Law Firm's Kansas and Nevada Auto Dealer clients were willing to join with other dealerships from around the country in pursuing nationwide price-fixing claims against the Defendants in a single MDL proceeding. At the encouragement of ICLC, attorneys for the Barton Law Firm met with the Kansas Auto Dealer Plaintiffs, Dale Martens Nissan Subaru, Inc. ("Martens"), Greet Team of Clay Center, Inc. ("Green Team"), and Ancona Enterprises, Inc. d/b/a Frank Ancona Honda ("Ancona"), and the Nevada Auto Dealer Plaintiffs, Reno Dodge Sales, Inc. ("Reno Dodge"), Herb Hallman Chevrolet, Inc. ("Herb Hallman"), and Bill Pearce Honda ("Pearce") to discuss asserting

2

their price-fixing claims against Defendants in the MDL and their rights and responsibilities as named plaintiffs in the MDL.

3.     In March 2012, the Barton Law Firm executed contingent fee agreements with Martens and Green Team to represent them in their claims against the Defendants named in the Dealership Actions in this MDL.  On April 17, 2012, the Barton Law Firm executed a contingent fee agreement with Herb Hallman to represent it on its claims against the Defendants named in the Dealership Actions in this MDL.  On April 18, 2012, the Barton Law Firm executed a contingent fee agreement with Reno Dodge to represent it on its claims against the Defendants named in the Dealership Actions in this MDL.  On November 3, 2014, the Barton Law Firm executed a contingent fee agreement with Ancona to represent it on its claims against the Defendants named in the Dealership Actions in this MDL.  On December 22, 2014, the Barton Law Firm executed a contingent fee agreement with Pearce to represent it on its claims against the Defendants named in the Dealership Actions in this MDL.

4.     There are no other auto dealerships from the State of Kansas named as Plaintiffs in the Dealership Actions other than Martens, Green Team, and Ancona (collectively, "Kansas Auto Dealers").  There are no other auto dealership from the State of Nevada named as Plaintiffs in the Dealership Actions other than Herb Hallman, Reno Dodge, and Pearce (collectively, "Nevada Auto Dealers").

5.     The Barton Law Firm has represented the Kansas and Nevada Auto Dealers in this litigation on a contingent basis, without any guarantee of being paid for its time or being reimbursed for its expenses and travel devoted to pursuit of the cases involved currently before this Court.

6.     Between February 2012 and October 3, 2016, at the request of ICLC and on behalf of the Kansas and Nevada Auto Dealers, the Barton Law Firm worked with the Kansas and Nevada Auto Dealers to advance the litigation, including:

a) Six separate trips to Nevada, and five separate driving trips to Clay Center, Kansas and Manhattan, Kansas to work with the Kansas and Nevada Auto Dealer Plaintiffs in all aspects of the MDL litigation. Throughout their participation in this MDL, the Kansas and Nevada Auto Dealer Plaintiffs almost always met with the Barton Law Firm to work on and discuss their MDL claims. The Kansas and Nevada Auto Dealer Plaintiffs have not met with the ICLC or other law firms representing the Plaintiffs, except for a few rare occasions when another attorney participated in a phone conference with the Kansas and/or Nevada Auto Dealer Plaintiffs or participated in Champion's and Reno Dodge's Rule 30(b)(6) deposition.

b) Answering written discovery, which has included hundreds of numerous telephone and email conferences between the Barton Law Firm and ICLC to discuss Defendants' discovery requests and other discovery issues, and numerous telephone and email conferences between the Barton Law Firm and the Kansas and Nevada Auto Dealer Plaintiffs to discuss the scope of the discovery requests, the Kansas and Nevada Auto Dealer Plaintiffs' responsibilities in answering the written discovery requests, and otherwise helping the Kansas and Nevada Auto Dealer Plaintiffs respond to the written discovery requests.

c) Reviewing thousands of dealer files in order to gather Kansas and Nevada Auto Dealer Plaintiffs' new car invoices in response to Defendants' discovery requests. In order to produce the Kansas and Nevada Auto Dealers' new car invoices, the Barton Law Firm

4

was required to: (1) meet with the Kansas and Nevada Auto Dealer Plaintiffs to explain why the new car invoices were important; (2) work out logistics on the production of the new car invoices in order to make such production as efficient as possible; (3) travel numerous times to Clay Center, Kansas to work with Green Team Automotive to produce the new car invoices; (4) travel to Reno, Nevada for several days to work with Champion Chevrolet, Reno Dodge, and Pearce to produce new car invoices; and (5) travel to Ancona for several weeks to pull boxes in storage, review files, and gather and produce copies of new car invoices.

d) Reviewing thousands of pages of additional documents in order to produce documents responsive to Defendants' discovery requests, such as the Kansas and Nevada Auto Dealer Plaintiffs' financial statements, pay-sheets, and month-end OEM reports. Again, the Barton Law Firm traveled to the Kansas and Nevada Auto Dealer Plaintiffs' locations in Clay Center, Kansas and Reno, Nevada to gather, copy, and produce the documents.

e) Working with the Kansas and Nevada Auto Dealers to provide access to their data management systems, which required numerous phone conferences with the Kansas and Nevada Auto Dealer Plaintiffs to ensure access to the dealers' data management systems and answer questions regarding protecting proprietary information.

f) Preparation for the depositions of the Kansas and Nevada Auto Dealer Plaintiffs' Rule 30(b)(6) depositions, including two trips to Reno, Nevada and one trip to Manhattan, Kansas to meet with the Reno Dodge, Herb Hallman, and Green Team to discuss and prepare for Defendants' Rule 30(b)(6) depositions and present and represent Reno Dodge, Herb Hallman, and Green Team at their Rule 30(b)(6) depositions.

g) Meeting with counsel from Neal Harwell in preparation and presentation of Reno Dodge's and Champion Chevrolet's deposition. Counsel for the Barton Law Firm was the only attorney to meet and present Green Team Automotive for its deposition.

7. Since February 2012, ICLC has requested the Barton Law Firm to perform the work described herein. In addition, all of the work requested by ICLC related to all of the Kansas and Nevada Auto Dealers' claims for all products asserted against the Defendants in this MDL.

8. From February 2012, through October 3, 2016, the Barton Law Firm has invested substantial time in this litigation that could have been spent on other matters. While ICLC has reimbursed the Barton Law Firm for most of its expenses, the Barton Law Firm has not been paid for the legal work it has performed since February 2012. ICLC has only paid the Barton Law Firm a small referral fee in the amount of $47,976.48, which represent approximately 0.26% of the $18,500,158 in attorneys' fees awarded to ICLC by this Court on December 7, 2015.

9. Attached to this Affidavit as Exhibits 1-5 are summaries reflecting the hours worked on this class action litigation by the Barton Law Firm's attorneys, paralegals, and a law clerk who are or have previously been employed by the Barton Law Firm, their hourly rates and their time value invested in this litigation. The hours that are reflected for each attorney are derived from the time records maintained by the Barton Law Firm for this class action MDL. The time records of the Barton Law Firm for this litigation reflect hours worked on this litigation by various attorneys, paralegals, and a law clerk employed by the Barton Law Firm, and the recording such hours is generally done at or near the time that such person's work on this litigation has been performed. The Barton Law Firm's time records for this litigation are available for review and inspection by the Court upon request, should the Court determine that such review is warranted.

6

10. Exhibits 1 through 5 were compiled under my direction, and to my knowledge accurately reflect the hours worked by the attorneys, paralegals, and law clerk currently or formerly employed by the Barton Law Firm, and also accurately reflect the description of the work that each of them has performed in connection with this class action MDL through October 3, 2016. Based upon my knowledge of the work that has needed to be done in this class action MDL, and my knowledge of the work that has been assigned to various attorneys, paralegals, or law clerk who have been employed by the Barton Law Firm, I believe that all of the time worked by such attorneys, paralegals, and law clerk in connection with this class action MDL has been reasonably and necessarily expended to properly handle various projects, assignments, discovery, and other matters involved in this class action MDL.

11. I have reviewed the declarations of ICLC Don Barrett, Jon Cuneo, and Shawn Raiter and the hourly rates and legal work reflected in their declarations filed with the Court on October 14, 2015. Based on the legal work and hourly rates reflected in ICLC's declarations and based on my legal experience and knowledge of hour rates that are currently being charged by other class action attorneys in other class action lawsuits with which I am familiar, the hourly rates for each of the Barton Law Firm's attorneys are comparable to the hourly rates being charged by ICLC, which have been previously approved by this Court based on its December 7, 2015 attorneys' fee award. For the same reasons, the hourly rate for the Barton Law Firm's paralegals - $150 an hour – and for the Barton Law Firm's law clerk - $225 an hour - are appropriate and comparable to paralegal and law clerk rates that are being charged or submitted by ICLC and other law firms in other complex class action litigation cases.

7

12.     Between February 2012 and October 3, 2016, the total number of hours of legal services performed by the attorneys, paralegals, and law clerks at the Barton Law Firm is 994.80, and when multiplied by their hourly rates, equals a total time value of $556,880.

13.     ICLC has determined that 2.6% of the total attorneys' fees awarded by this Court in this class action MDL are attributable to the Nevada and Kansas Auto Dealers' claims in this MDL. Attached to the Barton Law Firm's motion for an award and distribution of attorneys' fees is Exhibit 1, which is break down of the referral fees paid by ICLC to local counsel. As set forth in Exhibit 1, Kansas represents 1.7% of the total amounts at issue and awarded in this class action MDL, and Nevada represents 0.9% of the total amounts at issue and awarded in this class action MDL. The Barton Law Firm is requesting the Court award it fifty percent of the fees attributable to the Kansas and Nevada portion of the MDL. ICLC has paid a small referral fee to the Barton Law Firm in the amount of $47,976.48, while offering an additional amount of approximately $300,000 for all of the Barton Law Firm's current and future legal services in this case.

14.     The Court has already awarded ICLC $18,500,158 from the first common settlement fund, which is approximately 31 percent of the first common settlement fund secured for the benefit of the eligible auto dealer class members. (Dk. No. 1398, Case No. 12-md-2311). Assuming the same percentage is awarded to ICLC based on the second common settlement fund in the amount of approximately $124,740,130, ICLC will receive an additional $38,669,440.30 for attorneys' fees, and when added with the Court's first attorneys' fees award, ICLC will receive a total attorneys' fee award of $57,169,598.30.

15.     The Barton Law Firm is requesting the Court award it fifty percent of the fees attributable to the Kansas and Nevada Auto Dealer Classes from the first two groups of settlements, which equals $743,204.78. When the $47,976.48 is taken into account in the Barton Law Firm's

8

attorneys' fee request of fifty percent of the amounts attributable to the Nevada and Kansas Auto Dealers' claims in this MDL, the Court should award the Barton Law Firm $695,228.30, not the $300,000 offered by ICLC.

16.     Presently, an award of fifty percent of the attorneys' fees awarded and to be awarded to the Barton Law Firm as described herein will represent a 1.33 lodestar multiplier of the Barton Law Firm's legal fees.

AFFIANT FURTHER SAYETH NAUGHT

DATED: October 12, 2016



Robert G. Harken

Subscribed and sworn to before me on October 12, 2015 by Robert G. Harken.

Witness my hand and official seal.

Notary Public

My commission expires:

AMBER GARNETT
Notary Public, State of Kansas
My Appointment Expires
03 | 17 | 2018

**EXHIBIT 1**

**Summary of Hours Worked and Description of Work done by Attorney George Barton of The Law Offices of George A. Barton, P.C. from February 1, 2012 through October 3, 2016.**

**Hours: 291**          **Hourly Rate: $750**          **Time Value: $218,250**

Mr. Barton has been continuously involved in various aspects of this class action MDL since his work in this case began in February 2012. Starting in February 2012, Mr. Barton and Mr. Don Barrett met several times over the phone and by e-mail to discuss the various claims to be asserted against Defendants in the class action MDL. Pursuant to these meetings and discussions, Mr. Don Barrett requested The Law Offices of George A. Barton, P.C. provide legal services on behalf of the Kansas and Nevada Auto Dealer Plaintiffs in the class action MDL. Pursuant to Mr. Barrett's requests and communications, Mr. Barton has provided extensive legal work on behalf of the auto dealer plaintiffs in the class action MDL. At the request of Mr. Barrett, Mr. Barton's work has included: (1) telephone, email, and travel for an in person meeting in Topeka, Kansas with Mr. Pat Barnes, attorney for the Kansas Motor Dealers Association, to discuss the claims asserted against the Defendants in the class action MDL; (2) telephone, email, and in person meetings in early 2012 with Kansas Auto Dealer Plaintiffs Dale Martens Nissan Subaru and Green Team Automotive of Clay Center, Kansas to discuss the claims asserted against the Defendants in the class action MDL, damages suffered by the Kansas Auto Dealers, and the potential role of Dale Martens Nissan Subaru and Green Team Automotive in the class action MDL; (3) meetings with Kansas Auto Dealer Plaintiff Frank Ancona Honda to discuss and answer questions regarding the claims asserted against the Defendants, damages suffered by Frank Ancona Honda, and Frank Ancona Honda's role as a named plaintiffs in the class action lawsuit; (4) telephone, email and travel to Las Vegas, Nevada for an in person meeting with Wayne Frediani, executive director for the Nevada Franchised Auto Dealers Association to discuss the claims asserted against the Defendants in the class action MDL; (5) telephone, email, and travel to Nevada for in person meetings with Nevada Auto Dealer Plaintiffs Reno Dodge, Champion Chevrolet, and Bill Pearce Honda ("Nevada auto dealer plaintiffs) to discuss and answer questions regarding the claims asserted against the Defendants, damages, and the Nevada Auto Dealer Plaintiffs' roles as named plaintiffs in the class action MDL against Defendants; (6) legal research of Kansas and Nevada law involved in the claims asserted against the Defendants in the class action MDL and communications with the Kansas and Nevada Auto Dealer Plaintiffs regarding Kansas and Nevada law; (7) work with the Kansas and Nevada Auto Dealer Plaintiffs on their initial disclosures and providing information related to their business to lead counsel; (8) work with the Kansas and Nevada Auto Dealer Plaintiffs to answer Defendants' written discovery requests, produce new car invoices, and produce wire harness product sale invoices; (9) work with the Kansas and Nevada Auto Dealer Plaintiffs on issues involving settlement, class notice, filing of claims to recover from the class settlement funds and approval of settlement agreements; (10) work with the Kansas and Nevada Auto Dealer Plaintiffs on various other claims involving other auto parts against Defendants in the class action MDL; (11) discussions with Mr. Barrett regarding discovery and the extent of damages on certain brands of vehicles such as Honda and work with Frank Ancona Honda to produce new car invoices and other discovery; (12) review numerous pleadings, motions, and discovery orders entered in MDL in order to work with and communicate with Kansas and Nevada Auto Dealer Plaintiffs about their discovery responses and obligations; (13) numerous

conferences with Mr. Barrett and Mr. Cuneo regarding the Kansas and Nevada Auto Dealer Plaintiffs' production of electronic data from their data management systems; (14) continuous work with the Kansas and Nevada Auto Dealer Plaintiffs on class settlement issues, class certification issues, and information required to be produced by the Kansas and Nevada Auto Dealer Plaintiffs in support of class settlement; and (15) conferences with Mr. Harken and the Kansas and Nevada Auto Dealer Plaintiffs regarding the Kansas and Nevada Auto Dealer Plaintiffs' depositions.

## EXHIBIT 2

**Summary of Hours Worked and Description of Work done by Attorney Robert Harken of The Law Offices of George A. Barton, P.C. from February 1, 2012 through October 3, 2016.**

**Hours: 652**          **Hourly Rate: $500**          **Time Value: $326,000.00**

Mr. Harken has been continuously involved in various aspects of this class action MDL since his work in this case began in 2012. At the request of lead counsel, Mr. Harken has worked extensively on client retention including conducting numerous in person, email, and telephone conferences with the Kansas and Nevada Auto Dealer Plaintiffs to discuss the Defendants' price-fixing practices and the damages caused by such price-fixing practices. Further, at the request of lead counsel, Mr. Harken has been the point person to communicate, work with, and coordinate discovery and the settlement of claims with the Kansas and Nevada Auto Dealer Plaintiffs. Mr. Harken's work has included: (1) gathering, copying, and producing thousands of pages of sensitive documents and information related to the Kansas and Nevada Auto Dealer Plaintiffs' new car sales, financial statements, data management systems, and numerous other aspects of the Kansas and Nevada Auto Dealer Plaintiffs' businesses in response to Defendants' discovery requests; (2) travel to Clay Center, Kansas three different times between June 2014 and October 2014 to work with Green Team Automotive's employees to gather, copy, and produce new car invoices and wire harness product invoices; (3) travel twice to Reno, Nevada to work with Reno Dodge's and Champion's employees to gather, copy, and produce new car invoices and wire harness product invoices and to meet with Bill Pearce Honda to discuss Defendants' price-fixing practices and damages caused from the Defendants' price-fixing practices; (4) travel to Frank Ancona Honda in Olathe, Kansas for several weeks in December 2014 and January 2015 to work with Frank Ancona Honda's employees to gather, copy, and produce new car invoices; (5) travel to Reno, Nevada in July 2015 for several days to work with Champion Chevrolet's, Reno Dodge's, and Bill Pearce Honda's employees to gather, copy, and produce financial statements, new car invoices, and various other documents responsive to Defendants' discovery requests; (6) travel to Clay Center, Kansas in July 2015 to work with Green Team Automotive's employees to produce financial statements and other documents responsive to Defendants' discovery requests; (7) travel to Nashville, Tennessee in October 2015 at the request of lead counsel to discuss depositions of auto dealers; (8) telephonic meetings with the Kansas and Nevada Auto Dealer Plaintiffs to discuss Kansas and Nevada anti-trust laws and upcoming depositions; (9) at the request of lead counsel, work with Kansas and Nevada Auto Dealer Plaintiffs on filing of their claims for damages from the first class settlement funds, including gathering and producing all supporting documents for such claims; (10) travel to Reno, Nevada in June 2016 for Reno Dodge's deposition; (11) travel to Reno, Nevada in August 2016 for Champion Chevrolet's deposition; and (12) travel to Manhattan, Kansas in August 2016 for Green Team Automotive's deposition.

**EXHIBIT 3**

**Summary of Hours Worked and Description of Work done by Attorney Stacy Burrows of The Law Offices of George A. Barton, P.C. from February 1, 2012 through October 3, 2016.**

**Hours: 7.70**          **Hourly Rate: $500**          **Time Value: $3,850.00**

At the request of lead counsel, Ms. Burrows has worked extensively on client retention in February and March 2012, including discussing with the Kansas and Nevada Auto Dealer Plaintiffs their rights and responsibilities as class representatives. Ms. Burrows also worked with the Kansas and Nevada Auto Dealer Plaintiffs on their initial disclosures and corporate disclosure forms.

## EXHIBIT 4

**Summary of Hours Worked and Description of Work done by Attorney Catherine McLeod of The Law Offices of George A. Barton, P.C. from February 1, 2012 through October 3, 2016.**

**Hours: 10.60**          **Hourly Rate: $350**          **Time Value: $3,710.00**

At the request of lead counsel, Ms. McLeod has worked extensively on client retention in 2012, including meetings with Mr. Pat Barnes, attorney for the Kansas Motor Dealers Association, working with Mr. Barton in preparation for meeting with Nevada Auto Dealer Plaintiffs, and discussing with the Kansas and Nevada Auto Dealer Plaintiffs their rights and responsibilities as class representatives and maintaining documents and information related to new car sales. Ms. McLeod also worked with the Kansas and Nevada Auto Dealer Plaintiffs on their initial disclosures and corporate disclosure forms.

EXHIBIT 5

**Summary of Hours Worked and Description of Work done by Paralegals and Law Clerks employed by The Law Offices of George A. Barton, P.C. from February 1, 2012 through October 3, 2016.**

|                                   | **Hours** | **Hourly Rate** | **Time Value** |
|-----------------------------------|-----------|-----------------|----------------|
| **Margo Barton, Paralegal**       | 9.75      | $150.00         | $1,462.50      |
| **Amber Garnett, Paralegal**      | 10.95     | $150.00         | $1,642.50      |
| **Jessica Morales, Paralegal**    | 12.20     | $150.00         | $1,830.00      |
| **Madeline Stuart, Law Clerk**    | 0.60      | $225.00         | $135.00        |

Ms. Barton's work included client retention, working with Mr. Barton in preparing for meetings with Nevada and Kansas Auto Dealer Plaintiffs, and contacting Dale Martens to discuss its business operations, new car sales, and other information requested from lead counsel.

Ms. Garnett's and Ms. Morales' work included client retention, contacting Kansas and Nevada Auto Dealer Plaintiffs regarding their initial disclosures and types of auto parts sold, and working with Mr. Barton and Mr. Harken in preparing for meetings with the Kansas and Nevada Auto Dealer Plaintiffs regarding various aspects of litigation and discovery.

Ms. Stuart provided legal research.