**REDACTED**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311<br>Honorable Marianne O. Battani |
| In re: AIR CONDITIONING SYSTEMS | 2:13-cv-02702-MOB-MKM |
| THIS DOCUMENT RELATES TO:<br><br>ALL AUTOMOBILE DEALER ACTIONS | SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

Landers Auto Group No. 1, Inc. d/b/a Landers Toyota ("Plaintiff Landers"); Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Panama City Automotive Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"); McGrath Automotive Group, Inc. ("Plaintiff McGrath"); Green Team of Clay Center Inc. ("Plaintiff Green Team"); Lee Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Commonwealth Volkswagen, Inc. d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda ("Plaintiff Ancona"); Landers McLarty Lee's Summit MO, LLC d/b/a Lee's Summit Chrysler Dodge Jeep Ram and d/b/a Lee's Summit Nissan ("Plaintiff Lee's Summit"); Archer-Perdue, Inc. d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-

REDACTED

Perdue"); Table Rock Automotive, Inc. d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Bill Pearce

Honda ("Plaintiff Pearce"); Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir");

Pitre, Inc. d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley");

Westfield Dodge City, Inc. ("Plaintiff Westfield"); John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John

Greene"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Capitol

Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc. d/b/a Capitol Toyota

("Plaintiff Capitol Toyota"); Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville"); Central Salt

Lake Valley GMC Enterprises, LLC d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley");

Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); Apex Motor Corporation ("Plaintiff

Apex"); Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Ramey Motors, Inc. ("Plaintiff

Ramey"); Thornhill Superstore, Inc. d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); and Dave Heather

Corporation d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland") ("Plaintiffs") on behalf of

themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as

to the facts pertaining to themselves and upon information and belief as to all other matters, and based on

the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant

to federal antitrust laws and state antitrust, unfair competition, consumer protection laws, and the common

law of unjust enrichment, and allege as follows:

## NATURE OF ACTION

1.      This lawsuit is brought as a proposed class action against Defendants Mitsubishi Heavy

Industries, Ltd., Mitsubishi Heavy Industries America, Inc., Mitsubishi Heavy Industries Climate Control,

Inc. (collectively, "Mitsubishi"), Sanden Automotive Components Corporation, Sanden Automotive

Climate Systems Corporation, Sanden International (U.S.A.) Inc. (collectively, "Sanden"), Showa Denko

K.K., Showa Aluminum Corporation of America (together, "Showa Denko"), Calsonic Kansei Corporation,

REDACTED

CalsonicKansei North America, Inc. (together, "Calsonic"), Panasonic Corporation, Panasonic Corporation of North America (together, "Panasonic"), MAHLE Behr GmbH & Co. KG and MAHLE Behr USA Inc. (together, "Behr") (collectively, "Defendants"), and unnamed co-conspirators, manufacturers and/or suppliers of Air Conditioning Systems (defined below) for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Air Conditioning Systems.

2.    Plaintiffs seek to represent all dealerships who, during the period from and including May 1, 1999 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Class Period"), purchased a new vehicle in the United States which included one or more Air Conditioning System(s) as a component part, which were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants or any co-conspirator of the Defendants.

3.    "Air Conditioning Systems" are systems that cool the interior environment of a vehicle and are part of the thermal segment of the automotive market.  Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following:  automotive compressors, condensers, HVAC units (typically consisting of a blower motor, actuators, flaps, evaporator, heater core, and filter embedded in a plastic housing), control panels, sensors, and associated hoses and pipes.

4.    The Defendants manufacture, market, and sell Air Conditioning Systems throughout and into the United States.  The Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to fix, raise, maintain and/or stabilize prices, and allocate market shares for Air Conditioning Systems.[1]

---

[1] Plaintiffs believe the Air Conditioning Systems conspiracy may encompass the Heater Control Panel conspiracy.  As Air Conditioning Systems is still subject to a discovery stay, however, Plaintiffs have not begun discovery concerning the nature and scope of the Air Conditioning Systems conspiracy.  Plaintiffs still have substantial discovery to conduct regarding Defendants' meetings, discussions, and agreements.

REDACTED

5.      The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.

6.      The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct.  The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.5 billion in criminal fines. The European Commission Competition Authority ("EC") and Japanese Fair Trade Commission ("JFTC") have also conducted dawn raids at the European and Japanese offices of several automotive parts manufacturers.

7.      On January 30, 2012, the DOJ announced that Co-conspirator Denso Corporation agreed to plead guilty to a two-count criminal Information and to pay a $78 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain electronic control units ("ECUs") and heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 until at least February 2010.  The combination and conspiracy engaged in by Co-conspirator Denso Corporation and its co-conspirators was an unreasonable

---

Plaintiffs must be able to significantly advance the inquiry into, and analysis of, Defendants' conspiratorial conduct before they can firmly reach conclusions regarding the nature, scope, and effects of the Air Conditioning Systems and Heater Control Panel conspiracies.  As such, while Plaintiffs have currently pled the Air Conditioning Systems and Heater Control Panel conspiracies as separate, further discovery may reveal that there was one overarching conspiracy involving Air Conditioning Systems and Heater Control Panels or two separate conspiracies.

4

REDACTED

restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.     In addition to the fact that Co-conspirator Denso Corporation pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperate in the government's investigation, several of its high-ranking executives have pleaded guilty to criminal price-fixing in the automotive parts industry.

9.     On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Co-conspirator Denso Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

10.    On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Co-conspirator Denso Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

11.    On November 22, 2012, the JFTC announced that it fined Defendant Calsonic Kansei $2.04 million for violating Japanese antitrust laws by forming a cartel to rig bids for and to fix the prices of automotive radiators and electrical fans.

12.    On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Co-conspirator Denso Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold in the United States and elsewhere. Also on May 21, 2013, the DOJ announced that Hiroshi Watanabe, an executive of Co-conspirator Denso Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal

REDACTED

Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere.

13.     On July 18, 2013, the DOJ announced that Defendant Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of high intensity discharge ("HID") ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.  Previously, on September 30, 2010, Defendant Panasonic Corporation pleaded guilty to a one-count Indictment and agreed to pay a $49.1 million fine for participating in a combination and conspiracy to fix the prices of refrigerant compressors sold in the United States and elsewhere.

14.     On September 26, 2013, the DOJ announced that Valeo Japan Co., Ltd. agreed to plead guilty and pay a $13.6 million criminal fine for its role in a conspiracy to fix prices of certain Air Conditioning Systems and related components sold to Nissan North America, Inc., Suzuki Motor Corporation, and Fuji Heavy Industries Ltd., in the United States and elsewhere, from at least as early as April 2006 until at least February 2010.

15.     On September 26, 2013, the DOJ announced that Mitsubishi Heavy Industries Ltd. agreed to plead guilty and pay a $14.5 million criminal fine for its role in a conspiracy to fix the prices of condensers and compressors sold to General Motors LLC and Mitsubishi Motors North America, Inc., in the United States and elsewhere, from at least as early as January 2001 until at least February 2010.

16.     On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Co-conspirator Denso Corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Co-conspirator Denso International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles sold in the United States and elsewhere.

6

REDACTED

17.     On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Co-conspirator Denso Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, automotive instrument panel clusters sold to Honda of America Manufacturing Co. Inc., in the United States and elsewhere.

18.     On January 27, 2015, the DOJ announced that Sanden Corporation agreed to plead guilty to a one count criminal Information and pay a $3.2 million criminal fine for its role in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to fix, stabilize, and maintain the prices of compressors used in automotive air conditioning systems sold to Nissan North America, Inc. in the United States and elsewhere from at least as early as August 2008 until at least April 2009.

19.     The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Air Conditioning Systems sold to automobile manufacturers and others in the United States.   The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment.

20.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Air Conditioning Systems during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

21.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against the Defendants for violating Section 1 of the Sherman Act (15 U.S.C.

REDACTED

§ 1).   Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

23.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

24.     This Court has *in personam* jurisdiction over the Defendants because the Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Air Conditioning Systems throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in,

8

REDACTED

or doing business throughout the United States, including in this District.  The Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

25.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

26.     The activities of the Defendants and their co-conspirators directly targeted the United States automobile market and were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

27.     Air Conditioning Systems manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Air Conditioning Systems are purchased in the United States, and such Air Conditioning Systems do not constitute import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

28.     By reason of the unlawful activities hereinafter alleged, the Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Air Conditioning Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Air Conditioning Systems.

9

REDACTED

29.    The Defendants' conspiracy and wrongdoing described herein adversely affected automobile dealerships, in the United States, including Dealership Plaintiffs, who purchased a new vehicle in the United States which included one or more Air Conditioning Systems.

## PARTIES

### Plaintiffs

30.    Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Plaintiff Landers is an authorized Toyota, Scion dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Landers purchased and received the aforementioned Vehicles in Arkansas.

31.    Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California. Plaintiff Empire Nissan is an authorized Nissan dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Empire Nissan purchased and received the aforementioned Vehicles in California.

32.    Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California. Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff V.I.P. purchased and received the aforementioned Vehicles in California.

33.    Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized Nissan dealer. During the Class Period, Plaintiff Lee was an authorized Nissan, GMC, Pontiac, Oldsmobile, and Jeep dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators.  Plaintiff Lee purchased and received the aforementioned Vehicles in Florida.

REDACTED

34.     Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida. During the Class Period, Plaintiff John Lee was an authorized Nissan dealer that purchased Vehicles containing Air Conditioning Systems manufactured by the Defendants or their co-conspirators. Plaintiff John Lee purchased and received the aforementioned Vehicles in Florida.

35.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa. Plaintiff McGrath is an authorized Buick, Cadillac, Chevrolet, GMC, Pontiac, Chrysler, Jeep, Dodge, RAM, Kia, Mazda, and Volkswagen dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff McGrath purchased and received the aforementioned Vehicles in Iowa.

36.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas. Plaintiff Green Team is an authorized Jeep, Dodge, and Ram dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Green Team purchased and received the aforementioned Vehicles in Kansas.

37.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota and Scion dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Topsham purchased and received the aforementioned Vehicles in Maine.

38.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine. Plaintiff Lee Honda is an authorized Honda, Oldsmobile, Cadillac, and GMC dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lee Honda purchased and received the aforementioned Vehicles in Maine.

39.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.    Plaintiff Commonwealth Volkswagen is an authorized

REDACTED

Volkswagen dealer, who bought Volkswagen-brand Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Commonwealth Volkswagen purchased and received the aforementioned Vehicles in Massachusetts.

40.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hodges purchased and received the aforementioned Vehicles in Michigan.

41.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan. Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Patsy Lou purchased and received the aforementioned Vehicles in Michigan.

42.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore currently an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. During the Class Period, Plaintiff Superstore was an authorized Buick, Pontiac, GMC, and Hyundai dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators. Plaintiff Superstore bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Superstore purchased and received the aforementioned Vehicles in Minnesota.

43.     Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon Nissan is an authorized Nissan dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Cannon Nissan purchased and received the aforementioned Vehicles in Mississippi.

12

REDACTED

44.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is currently an authorized Ford dealer. During the Class Period, Plaintiff Hammett was an authorized Ford and Mercury dealer who bought Vehicles containing Air Conditioning Systems manufactured by one or more Defendants and/or their co-conspirators. Plaintiff Hammett purchased and received the aforementioned Vehicles in Mississippi.

45.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Johnson purchased and received the aforementioned Vehicles in Mississippi.

46.     Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas. Plaintiff Ancona was an authorized Honda dealer during the Class Period, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ancona purchased and received the aforementioned Vehicles in Kansas.

47.     Plaintiff Lee's Summit is a Missouri corporation with its principal place of business in Lee's Summit, Missouri. Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep, RAM, and Nissan dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Lee's Summit purchased and received the aforementioned Vehicles in Missouri.

48.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska. Plaintiff Archer-Perdue is an authorized Suzuki dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Archer-Perdue purchased and received the aforementioned Vehicles in Nebraska.

REDACTED

49.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska. Plaintiff Table Rock is an authorized Hyundai dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Table Rock purchased and received the aforementioned Vehicles in Nebraska.

50.     Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period. Plaintiff Pearce was an authorized Honda dealer during the Class Period, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pearce purchased and received the aforementioned Vehicles in Nevada.

51.     Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada. Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff Don Weir purchased and received the aforementioned Vehicles in Nevada.

52.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico. Plaintiff Pitre is an authorized Buick, Hummer, Pontiac, and GMC dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pitre purchased and received the aforementioned Vehicles in New Mexico.

53.     Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York. During the Class Period, Plaintiff Hartley was an authorized Honda, Buick, and GM dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hartley purchased and received the aforementioned Vehicles in New York.

14

REDACTED

54. Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York. Plaintiff Westfield is an authorized Dodge dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Westfield purchased and received the aforementioned Vehicles in New York.

55. Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene was an authorized Chrysler, Dodge, Jeep, RAM, Plymouth, and Oldsmobile dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff John Greene purchased and received the aforementioned Vehicles in North Carolina.

56. Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Vehicles containing Air Conditioning Systems manufactured by one or more of the Defendants and/or their co-conspirators during the Class Period. Plaintiff Champion purchased and received both the afore-mentioned Vehicles in Nevada.

57. Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon. Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Chevrolet purchased and received the aforementioned Vehicles in Oregon.

58. Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon. Plaintiff Capitol Toyota is an authorized Toyota and Scion dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Toyota purchased and received the aforementioned Vehicles in Oregon.

**REDACTED**

59.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee. Plaintiff Fayetteville is an authorized Toyota and Scion dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Fayetteville purchased and received the aforementioned Vehicles in Tennessee.

60.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah. Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Salt Lake Valley purchased and received the aforementioned Vehicles in Utah.

61.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah. Plaintiff Wade is an authorized Toyota dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Wade purchased and received the aforementioned Vehicles in Utah.

62.     Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Apex purchased and received the aforementioned Vehicles in Vermont.

63.     Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont. Plaintiff Shearer is an authorized Honda dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Shearer purchased and received the aforementioned Vehicles in Vermont.

64.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia. Plaintiff Ramey was an authorized Scion, Buick, Chevrolet, Pontiac, and Oldsmobile dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-

16

**REDACTED**

conspirators during the Class Period. Plaintiff Ramey purchased and received the aforementioned Vehicles in West Virginia.

65.    Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia. Plaintiff Thornhill was an authorized Chevrolet, Buick, Pontiac, and GMC dealer, who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Thornhill purchased and received the aforementioned Vehicles in West Virginia.

66.    Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. During the Class Period, Plaintiff Lakeland was an authorized Toyota, Scion, Honda, Mazda, and Subaru dealer who bought Vehicles containing Air Conditioning Systems manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lakeland purchased and received the aforementioned Vehicles in Wisconsin.

### Defendants

67.    When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family.  The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families.  As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

### Mitsubishi Defendants

17

REDACTED

68.    Defendant Mitsubishi Heavy Industries, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Mitsubishi Heavy Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this district, during the Class Period.

69.    Defendant Mitsubishi Heavy Industries America, Inc. is a Delaware corporation with its principal place of business in New York, New York.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Heavy Industries, Ltd.  Defendant Mitsubishi Heavy Industries America, Inc. manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

70.    Defendant Mitsubishi Heavy Industries Climate Control, Inc. is an Indiana corporation with its principal place of business in Franklin, Indiana.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Heavy Industries, Ltd.  Defendant Mitsubishi Heavy Industries Climate Control, Inc. manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

**Sanden Defendants**

71.    Defendant Sanden Automotive Components Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  It is a subsidiary of and wholly owned and controlled by its parent, Sanden Holdings Corporation.  Sanden Holdings Corporation is a holding company, formed after the restructuring of the former Sanden Corporation.  Sanden Automotive Components Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

18

REDACTED

72.     Defendant Sanden Automotive Climate Systems Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.  It is a subsidiary of and wholly owned and controlled by its parent, Sanden Holdings Corporation.  Sanden Automotive Climate Systems Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

73.     Defendant Sanden International (U.S.A.) Inc. is a Texas corporation with its principal place of business in Wylie, Texas. It is a subsidiary of and wholly owned and/or controlled by its parent, Sanden Corporation. Sanden International (U.S.A.) Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

**Behr Defendants**

74.     Defendant MAHLE Behr GmbH & Co. KG ("MAHLE Behr") is a German corporation with its principal place of business in Stuttgart, Germany.  In 2013, MAHLE Behr acquired the Air Conditioning Systems business of Behr GmbH & Co. KG ("Behr"), and, upon information and belief, assumed Behr's liabilities.  As a result of the acquisition, MAHLE Behr – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

75.     Defendant MAHLE Behr USA Inc. is a Delaware corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, MAHLE Behr.  MAHLE Behr USA Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

REDACTED

### Showa Denko Defendants

76.     Defendant Showa Denko K.K. is a Japanese company with its principal place of business in Toyko, Japan. Showa Denko K.K. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

77.     Defendant Showa Aluminum Corporation of America is an Ohio corporation with its principal place of business in Mt. Sterling, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Showa Denko K.K.  Defendant Showa Aluminum Corporation of America – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

### Calsonic Defendants

78.     Defendant Calsonic Kansei Corporation is a Japanese corporation with its principal place of business in Saitama, Japan. Defendant Calsonic Kansei Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

79.     Defendant CalsonicKansei North America, Inc. is a Delaware corporation with its principal place of business in Shelbyville, Tennessee. It is a subsidiary of and wholly owned and/or controlled by its parent, Calsonic Kansei Corporation. Defendant CalsonicKansei North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled– manufactured, marketed, and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

20

REDACTED

**Panasonic Defendants**

80.     Defendant Panasonic Corporation is a Japanese company with its principal place of business in Osaka, Japan. Panasonic Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

81.     Defendant Panasonic Corporation of North America is a Delaware corporation with its principal place of business in Secaucus, New Jersey. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Panasonic Corporation. Panasonic Corporation of North America manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

## AGENTS AND CO-CONSPIRATORS

82.     Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

83.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

84.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

21

REDACTED

**Valeo Co-conspirators**

85.    Co-conspirator Valeo Japan Co., Ltd. is a Japanese corporation with its principal place of business in Saitama, Japan.  Valeo Japan Co., Ltd. – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

86.    Co-conspirator Valeo Inc. is a Delaware corporation with its principal place of business in Troy, Michigan.  It is an affiliate of and wholly controlled by Valeo Japan, Co., Ltd.  Valeo Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

87.    Co-conspirator Valeo Electrical Systems, Inc. is a Delaware corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Valeo Inc.  Valeo Electrical Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

88.    Co-conspirator Valeo Climate Control Corp. is a Delaware corporation with its principal place of business in Bingham Farms, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Valeo Electrical Systems, Inc.  Valeo Climate Control Corp. manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

89.    Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., Valeo Climate Control Corp. are collectively referred to as "Valeo."

**DENSO Co-conspirators**

REDACTED

90.     Co-conspirator Denso Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.  Co-conspirator Denso Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

91.     Co-conspirator Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  DENSO International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Air Conditioning Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

92.     DENSO Corporation and DENSO International America, Inc. are collectively referred to as "DENSO."

## FACTUAL ALLEGATIONS

### A.  The Air Conditioning Systems Industry

93.     Air Conditioning Systems are systems that cool the interior environment of a vehicle and are part of an automobile's thermal system.  Air Conditioning Systems, whether sold together or separately, are defined to include one or more of the following:  automotive compressors, condensers, HVAC units (typically consisting of a blower motor, actuators, flaps evaporator, heater core, and filter embedded in a plastic housing), control panels, sensors, and associated hoses and pipes.  The global automotive thermal industry is a $36 billion dollar a year industry.  According to a leading industry publication, the US market for automobile HVAC revenue is approximately $12.5 billion.

**REDACTED**

94.    Toyota awards over 80% of its contracts for automotive thermal system orders to Co-conspirator Denso Corporation.

95.    According to industry research firm TechNavio in its Global Automotive HVAC Systems Market 2012-2016 report, Co-conspirator DENSO and Co-conspirator Valeo are two of four key vendors that dominate the Global Automotive HVAC Systems market.  Co-conspirator Denso is the largest North American producer of thermal systems, followed by Co-conspirator Valeo.  Based on its annual report, Valeo earned approximately half a billion USD in 2012 for thermal system revenues, which includes Air Conditioning Systems revenues, from North America in 2012.

96.    According to the Global and China Automotive Air Conditioner Industry Report, 2009-2010, Defendant Mitsubishi is one of the key players in the compressor industry.  An Air Conditioning System and HVAC unit manufactured by Valeo are shown below, as is a Mitsubishi diagram illustrating the Air Conditioning System placement in a vehicle.

### VALEO AIR CONDITIONING SYSTEM & HVAC UNIT



AIR CONDITIONING LOOP SYSTEM

**REDACTED**



HVAC UNIT

## MITSUBISHI A/C SYSTEM DIAGRAM



REDACTED

97.     Air Conditioning Systems are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.

98.     For new cars, the OEMs—mostly large automotive manufacturers such as General Motors LLC, Mitsubishi Motors North America, Inc., Nissan North America, Inc., Suzuki Motor Corporation, Fuji Heavy Industries Ltd. (Subaru) – purchase Air Conditioning Systems directly from Defendants.   Air Conditioning Systems may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply Air Conditioning Systems directly to an OEM.

99.     When purchasing Air Conditioning Systems, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model specific parts.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.  Typically, the bidding process for a particular model begins approximately three years prior to the start of production of a new model.  OEMs procure parts for U.S.-manufactured vehicles in the United States and elsewhere.

100.    Defendants and their co-conspirators supplied Air Conditioning Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. The Defendants and their co-conspirators manufactured Air Conditioning Systems (a) in the United States and elsewhere for installation in vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

REDACTED

101.    Plaintiffs and members of the proposed Classes purchased Air Conditioning Systems indirectly from the Defendants.

**B.    The Structure and Characteristics of the Air Conditioning Systems Market Render the Conspiracy More Plausible**

102.    The structure and other characteristics of the Air Conditioning Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Air Conditioning Systems market: (1) has high barriers to entry; and (2) has inelasticity of demand.

**1.    The Air Conditioning Systems Market Has High Barriers to Entry**

103.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

104.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Air Conditioning Systems market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

105.    The Defendants own multiple patents related to the manufacture of Air Conditioning Systems. For example, Co-conspirator Denso owns at least two patents, Valeo at least three patents, Mitsubishi at least one patent, and Sanden at least one patent, related to the manufacture of Air Conditioning Systems. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

REDACTED

106. Moreover, Air Conditioning System, require a significant amount of technology and engineering expertise required to build systems that fully comply with environmental and public health requirements and other regulatory standards relating to Air Conditioning Systems.

107. In addition, OEMs cannot change Air Conditioning Systems suppliers randomly after a supplier is initially selected because the OEMs design the features of their vehicles so that the Air Conditioning Systems they purchase for a vehicle are then integrated with the other components of the powertrain system of the particular vehicle model. Thus, the design must be synergized by the Air Conditioning Systems manufacturers and OEMs. It would be difficult for a new market entrant to do so.

### 2. There is Inelasticity of Demand for Air Conditioning Systems

108. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

109. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

110. Demand for Air Conditioning Systems is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Air Conditioning Systems as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### C. Government Investigations

28

REDACTED

111.    A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts in general, and Air Conditioning Systems in particular.    A JFTC official told a leading legal publication that the international automotive parts investigation would continue to widen because the automotive industry as a whole comprises many sub-industries.    He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

112.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC.    The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

113.    On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers.    The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.    The DOJ has levied more than $2.5 billion in criminal fines against various automotive parts manufacturers.

114.    In February 2010, the JFTC raided the Tokyo offices of DENSO Corporation as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000.

115.    The JFTC raided offices of Defendants as part of the spreading investigation into suspected price fixing on automotive parts.    According to its 2011 Annual Report, DENSO Corporation was investigated on July 20, 2011 at various locations, including in Kariya, Aichi and some other sales branches in Japan.    And according to its 2011 Annual Report, Mitsubishi Electric Corporation has been subject to investigations conducted by the JFTC since July 2011.

REDACTED

116.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

117.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation. The FBI executed warrants and searched the offices of these companies, including DENSO Corporation's subsidiary in Southfield, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

118.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**Co-conspirator Valeo Japan Co., Ltd. Pleads Guilty to Price Fixing Air Conditioning Systems**

119.    On September 26, 2013, the DOJ announced that Valeo Japan Co., Ltd. agreed pay a $13.6 million criminal fine and to plead guilty to a one-count criminal Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automotive Air Conditioning Systems and components.

REDACTED

120.   According to the Information filed, Co-conspirator Valeo Japan Co., Ltd. and its co-conspirators carried out the certain automotive Air Conditioning Systems conspiracy by:

(a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of Air Conditioning Systems sold to automobile manufactures, on a model-by-model basis, in the United States and elsewhere;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling Air Conditioning Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and,

(g)     accepting payment for Air Conditioning Systems sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices.

**Defendant Mitsubishi Heavy Industries Ltd. Pleads Guilty to Price Fixing Compressors and Condensers**

121.   On September 26, 2013, the DOJ announced that Mitsubishi Heavy Industries, Ltd. agreed to plead guilty and pay a $14.5 million criminal fine and to plead guilty to a one-count criminal Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the

REDACTED

automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of components of AC Systems

122.    According to the criminal Information filed, Defendant Mitsubishi Heavy Industries, Ltd. and its co-conspirators carried out the AC Systems conspiracy by:

(a)    participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of components of AC Systems sold to automobile manufacturers in the United States and elsewhere;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)    submitting certain bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)    selling compressors and condensers to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)    accepting payment for AC System components sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices; and

(h)    engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

**Defendant Sanden Corporation Pleads Guilty to Price Fixing Compressors**

REDACTED

123.    On January 27, 2015, the DOJ announced that Sanden Corporation agreed pay a $3.2 million criminal fine and to plead guilty to a one-count criminal Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of compressors AC System components.

124.    According to the Information filed, Defendant Sanden Corporation and its co-conspirators carried out the AC Systems conspiracy by:

(a)    engaging in communications in the Eastern District of Michigan and elsewhere to discuss the bids and price quotations to be submitted;

(b)    meeting and agreeing to fix, stabilize, and maintain bid prices to be submitted;

(c)    submitting bids and price quotations in the United States and elsewhere in accordance with the agreement reached;

(d)    selling AC System components in the United States and elsewhere at collusive and noncompetitive prices; and

(e)    accepting payment for AC System components sold in the United States and elsewhere at collusive and noncompetitive prices.

**D.    <u>Likely Existence of a Cooperating Defendant</u>**

125.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

REDACTED

126.    In light of the guilty plea in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

### E.    Additional Criminal Pleadings in the Automotive Parts Industry

127.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

128.    In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust Division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars . . . ." Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

129.    On January 30, 2012, the DOJ announced that Yazaki Corporation agreed to plead guilty and to pay a $470 million criminal fine and DENSO Corporation, as stated above, agreed to plead guilty and to pay a $78 million criminal fine for their respective involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States. According to the three-count criminal Information filed against Yazaki, it engaged in three separate

REDACTED

conspiracies: (i) to rig bids for and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere; (ii) to rig bids for and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufacturers in the United States and elsewhere; and (iii) to fix, stabilize, and maintain the prices of fuel senders sold to an automobile manufacturer in the United States and elsewhere. According to the two-count felony charge against Co-conspirator Denso Corporation, it engaged in conspiracies to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold to an automobile manufacturer in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010.

130.    In the press release announcing the fines against Yazaki Corporation, its executives, and Co-conspirator Denso Corporation, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices . . . ." In the same press release, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

131.    On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Co-conspirator Denso Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

132.    On April 3, 2012, the DOJ announced that G.S. Electech, Inc. agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

35

REDACTED

133.    On April 23, 2012, the DOJ announced that Fujikura Ltd. agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

134.    On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Co-conspirator Denso Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

135.    On June 6, 2012, the DOJ announced that Autoliv Inc. agreed to plead guilty to a two-count criminal Information and to pay a $14.5 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

136.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

137.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. agreed to plead guilty and to pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain

**REDACTED**

the prices of, instrument panel clusters sold to an automobile manufacturer in in the United States and elsewhere.

138.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. agreed to plead guilty and to pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. in the United States and elsewhere. Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

139.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. *I say the biggest with respect to the* <u>*impact*</u> *on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation."* (emphasis added).

140.    On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Co-conspirator Denso Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of electronic control units and HCPs sold in the United States and elsewhere.  Also on May 21, 2013, the DOJ announced that Hiroshi Watanabe an executive of Co-conspirator Denso Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere.

REDACTED

141.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. agreed to plead guilty and to pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, ignition coils sold to automobile manufacturers in the United States and elsewhere.

142.    In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

143.    On July 18, 2013, Defendant Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of HID ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

144.    On September 26, 2013, nine Japanese automotive suppliers, including Defendant Mitsubishi Heavy Industries and Co-conspirator Valeo, agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different automotive products:

(a)    Hitachi Automotive Systems Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts, including, among others, air flow meters, fuel injection systems, and electronic throttle bodies, sold to automobile manufacturers in the United States and elsewhere;

(b)    Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. Mitsuba also agreed to plead guilty to one count of obstruction of justice because of the company's efforts to

38

**REDACTED**

destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

(c)        Mitsubishi Electric Corporation agreed to plead guilty and pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)        Defendant Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in the conspiracy alleged herein;

(e)        T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers ("ATF warmers") sold to Toyota Motor Corporation in the United States and elsewhere;

(f)        Co-conspirator Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in the conspiracy alleged herein;

(g)        JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

(h)        NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

(i)        Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay an $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of

**REDACTED**

automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

145.    On the same day, September 26, 2013, then United States Attorney General Eric Holder presented the DOJ's most recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automotive parts sold to U.S. car manufacturers." Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies.  To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."

146.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.

REDACTED



147.    On October 9, 2013, Takata Corporation announced that it agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

148.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and constant-velocity-joint boots installed in automobiles in the United States and elsewhere.

REDACTED

149.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

150.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive HID lamp ballasts installed in cars sold in the United States and elsewhere.

151.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

152.    On February 13, 2014, the DOJ announced that Bridgestone Corp. agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

153.    On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Co-conspirator Denso corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Co-conspirator Denso International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles sold in the United States and elsewhere.

154.    On April 23, 2014, the DOJ announced that Showa Corporation agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in vehicles sold in the United States and elsewhere.

REDACTED

155.    On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Co-conspirator Denso Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, automotive instrument panel clusters sold to Honda, in the United States and elsewhere.

156.    On August 19, 2014, the DOJ announced that Defendant NGK Sparkplug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices of spark plugs, oxygen sensors, and air fuel ratio sensors installed in automobiles sold in the United States and elsewhere.

157.    On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

158.    On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

159.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

160.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and to pay a criminal fine of $4 million for

REDACTED

their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

161.    On March 31, 2015, the DOJ announced that Robert Bosch GmbH agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, oxygen sensors and starter motors sold to automobile and internal combustion engine manufacturers in the United States and elsewhere.

162.    On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to certain subsidiaries of Honda, in the United States and elsewhere.

163.    On September 3, 2015, the DOJ announced that NGK Insulators Ltd. agreed to plead guilty and to pay a $65.3 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of ceramic substrates for automotive catalytic converters supplied to automobile manufacturers in the United States and elsewhere.  The company also agreed to plead guilty to obstruction of justice for altering, destroying or concealing documents with the intent to impede the criminal antitrust investigation.

164.    To date, 36 companies and 55 executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry.  Each of the 36 companies has either pleaded guilty or agreed to plead guilty and altogether, they have agreed to pay a total of more than $2.5 billion in criminal fines.

165.    As stated by the FBI's Special Agent in Charge, Andrew G. Arena in a January 30, 2012 press release, "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also

REDACTED

affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold." As Mr. Arena previously said in a September 29, 2011 press release, "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system. The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

**Illustrative Examples**

**REDACTED**

**REDACTED**

**REDACTED**



REDACTED

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

████  ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████  ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

## CLASS ACTION ALLEGATIONS

179.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that during the Class Period,  (a) indirectly purchased Air Conditioning System(s) manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Air Conditioning System(s) manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

180.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states whose laws are set forth in the

REDACTED

Second and Third Claims below, (except California as to unjust enrichment claims), as well as unjust enrichment laws of Missouri, Massachusetts, Illinois, and South Carolina. The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, Illinois, and South Carolina are collectively referred to as the "Indirect Purchaser States." These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers in the Indirect Purchaser States, that, during the Class Period (a) indirectly purchased Air Conditioning System(s) manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased vehicles containing Air Conditioning System(s) manufactured by one of the Defendants or any current or former subsidary, affiliate or co-conspirator thereof.

181. The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Air Conditioning Systems directly from Defendants.

182. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

183. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

**REDACTED**

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Air Conditioning Systems sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)    The effect of the alleged conspiracy on the prices of Air Conditioning Systems sold in the United States during the Class Period;

(i)    Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(j)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(k)    The appropriate injunctive and related equitable relief for the Nationwide Class; and,

(l)    The appropriate class-wide measure of damages for the Damages Class.

REDACTED

184.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Air Conditioning Systems purchased indirectly from Defendants and/or their co-conspirators.

185.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

186.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

187.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

188.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY**

189.    The Defendants' price-fixing conspiracy had the following effects, among others:

REDACTED

(a)    Price competition has been restrained or eliminated with respect to Air Conditioning Systems;

(b)    The prices of Air Conditioning Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Indirect purchasers of Air Conditioning Systems have been deprived of free and open competition; and

(d)    Indirect purchasers of Air Conditioning Systems paid artificially inflated prices.

190.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Air Conditioning Systems.  OEMS inflated prices, which were paid by Plaintiffs and the members of the Classes.  Those overcharges have unjustly enriched Defendants.

191.    The markets for Air Conditioning Systems and vehicles are inextricably linked and intertwined because the market for Air Conditioning Systems exists to serve the vehicle market.  Without the vehicles, the Air Conditioning Systems have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Air Conditioning Systems.  As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier:  "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

192.    Air Conditioning Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Air Conditioning Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Air Conditioning Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

REDACTED

193.    Just as Air Conditioning Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Air Conditioning Systems affect prices paid by indirect purchasers of new motor vehicles containing Air Conditioning Systems.

194.    The inflated prices of Air Conditioning Systems in new motor vehicles resulting from the Defendants' and their co-conspirators' bid-rigging and price-fixing conspiracy have been paid by Plaintiffs and other class members.

195.    The purpose of the conspiratorial conduct of the Defendants and their co- conspirators was to raise, fix, rig or stabilize the price of Air Conditioning Systems and, as a direct and foreseeable result, the price of new motor vehicles containing Air Conditioning Systems.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Air Conditioning Systems on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Air Conditioning Systems affects changes in the price of new motor vehicles.  In such models, the price of Air Conditioning Systems would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Air Conditioning Systems impact the price of new motor vehicles containing Air Conditioning Systems while controlling for the impact of other price-determining factors.

54

REDACTED

196.    The precise amount of the overcharge impacting the prices of new motor vehicles containing Air Conditioning Systems can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge paid by automobile dealers.  Thus, the economic harm to Plaintiffs and class members can be quantified.

197.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  *I say the biggest with respect to the <u>impact</u> on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigatio*n."  (emphasis added).

198.    On September 26, 2013, then United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's then most recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers." Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."

199.    By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Air Conditioning Systems than they would have paid in the absence of the Defendants' and their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an

REDACTED

amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to

punish and prevent.

### PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

**A.** **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims**

200.    Plaintiffs repeat and re-allege the allegations set forth above.

201.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) September 26, 2013, the date that the DOJ publicly announced Co-conspirator Valeo Japan Co., Ltd.'s and Defendant Mitsubishi Heavy Industries, Ltd.'s anticipated guilty pleas. [2]

202.    Plaintiffs and the members of the Classes are purchasers who purchased automobiles.  They had no direct contact or interaction with the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before September 26, 2013, the date that the DOJ publicly announced Co-conspirator Valeo Japan Co., Ltd.'s and Defendant Mitsubishi Heavy Industries, Ltd.'s anticipated guilty pleas.

203.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to September 26, 2013, the date that the DOJ publicly announced Co-conspirator Valeo Japan

---

[2] Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) January 15, 2015 for Sanden, the date that the DOJ publicly announced it agreed to plead guilty, ███████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████.  No information in the public domain was available to the Plaintiffs and the members of the Classes prior to these dates that revealed sufficient information to suggest that the above named Defendants were involved in the combination or conspiracy alleged herein.  Therefore, the statute of limitations did not begin to run because Plaintiffs and members of the Classes did not and could not discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until January 15, 2015 for Sanden and February 24, 2015 for Showa Denko, Calsonic, Panasonic, and Behr.

REDACTED

Co., Ltd.'s and Defendant Mitsubishi Heavy Industries, Ltd.'s anticipated guilty pleas, that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig bids for Air Conditioning Systems.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

204.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

205.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 26, 2013, the date that the DOJ publicly announced Co-conspirator Valeo Japan Co., Ltd.'s and Defendant Mitsubishi Heavy Industries, Ltd.'s anticipated guilty pleas. [3]

206.    Before that time, Plaintiffs and the members of the Classes were unaware of the Defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for Air Conditioning Systems throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

---

[3] *See* footnote four.

REDACTED

207.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

208.    Specifically, as then Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

209.    A former executive of Co-conspirator Denso, Kazuaki Fujitani, pleaded guilty to a charge of obstruction of justice in which he admitted that he "corruptly destroyed and concealed records and documents by deleting numerous emails and electronic files from the period August 1, 2009 to January 4, 2010" for a related automotive part.

210.    By its very nature, the Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing.  Air Conditioning Systems are not exempt from antitrust regulation, and thus, before September 26, 2013, Plaintiffs reasonably considered the Air Conditioning Systems industry to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Air Conditioning System prices before September 26, 2013.

211.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

212.    Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof.  Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations.  The conspirators also

REDACTED

coordinated their pricing in a manner to avoid detection by the OEMs.  The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

213.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by the Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until September 26, 2013, the date that the DOJ publicly announced Co-conspirator Valeo Japan Co., Ltd.'s and Defendant Mitsubishi Heavy Industries, Ltd.'s anticipated guilty pleas.

214.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until September 26, 2013.

215.

216.

### FIRST CLAIM FOR RELIEF
**Violation of Section 1 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

217.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

218.    The Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

219.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

REDACTED

220.    During the Class Period, the Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Air Conditioning Systems, thereby creating anticompetitive effects.

221.    The anticompetitive acts were intentionally directed at the United States market for Air Conditioning Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Air Conditioning Systems throughout the United States.

222.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Air Conditioning Systems.

223.    As a result of the Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Air Conditioning Systems have been harmed by being forced to pay inflated, supra-competitive prices for Air Conditioning Systems.

224.    In formulating and carrying out the alleged agreement, understanding and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

225.    The Defendants' and their co-conspirators' conspiracy had the following effects, among others:

(a) Price competition in the market for Air Conditioning Systems has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for Air Conditioning Systems sold by the Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

60

REDACTED

(c) Plaintiffs and members of the Nationwide Class who purchased Air Conditioning Systems indirectly from the Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

226.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Air Conditioning Systems purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

227.    The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

228.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against the Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

229.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

230.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Air Conditioning Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

231.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Air Conditioning Systems and to allocate customers for Air Conditioning Systems in the United States.

REDACTED

232.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Air Conditioning Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Air Conditioning Systems sold in the United States;

(b)    allocating customers and markets for Air Conditioning Systems in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

233.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Air Conditioning Systems.

234.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

235.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, et seq.

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members

**REDACTED**

of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Air Conditioning Systems at supra-competitive levels.

(b)    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Air Conditioning Systems.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including

63

**REDACTED**

but not limited to the acts, practices, and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Air Conditioning Systems; and (2) Allocating among themselves the production of Air Conditioning Systems.

(d)    The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) Price competition in the sale of Air Conditioning Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Air Conditioning Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Air Conditioning Systems directly or indirectly from the Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Air Conditioning Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Air Conditioning Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3)

REDACTED

Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Air Conditioning Systems or vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Air Conditioning Systems or vehicles in the District of Columbia, paid supra-competitive, artificially inflated prices for Air Conditioning Systems, including in the District of Columbia.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

238.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

(a)     The Defendants' combinations or conspiracies had the following effects: (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

**REDACTED**

supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)      During the Class Period, the Defendants' illegal conduct substantially affected Illinois commerce.

(c)      As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, et seq.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.[4]

239.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

(a)      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Air Conditioning Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

---

[4] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal

**REDACTED**

(b)    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

241.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Maine; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

242.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

**REDACTED**

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

69

**REDACTED**

members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)    During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Air Conditioning Systems or vehicles in Mississippi, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Air Conditioning Systems or vehicles in Mississippi, paid supra-competitive, artificially inflated prices for Air Conditioning Systems, including in Mississippi.

REDACTED

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

245.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Air Conditioning Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

71

REDACTED

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Air Conditioning Systems or vehicles in Nevada,  were deprived of free and open competition, including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Air Conditioning Systems or vehicles in Nevada,   paid supra-competitive, artificially inflated prices for Air Conditioning Systems, including in Nevada.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*  Accordingly, Plaintiffs and

REDACTED

members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

247.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

248.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

73

**REDACTED**

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

249.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Air Conditioning Systems or vehicles in New York, were deprived of free and open competition,

REDACTED

including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Air Conditioning Systems or vehicles in New York, paid supra-competitive, artificially inflated prices for Air Conditioning Systems when they purchased, including in New York.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Air Conditioning Systems or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Air Conditioning Systems or vehicles in North Carolina, paid

75

**REDACTED**

supra-competitive, artificially inflated prices for Air Conditioning Systems, including in North Carolina.

(b)    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

REDACTED

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*  Accordingly, Plaintiffs and

**REDACTED**

members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Air Conditioning Systems or vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Air Conditioning Systems or vehicles in South Dakota, paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems, including in South Dakota.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

REDACTED

254.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Air Conditioning Systems or vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Air Conditioning Systems or vehicles in Tennessee, paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems, including in Tennessee.

(b)    During the Class Period, the Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

255.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq*.

REDACTED

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Utah; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

256.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq.*

(a)    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

80

REDACTED

members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2451, *et seq.*

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Air Conditioning Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Air Conditioning Systems or vehicles in West Virginia, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Air Conditioning Systems or vehicles in West Virginia, paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems, including in West Virginia.

REDACTED

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

82

REDACTED

      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

259.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the Damages Class have paid more for Air Conditioning Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

260.    In addition, Defendants have profited significantly from the aforesaid conspiracy.  Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

261.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Class)

262.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

263.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

REDACTED

264.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, et seq.

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Air Conditioning Systems were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)    Defendants' unlawful conduct had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(d)    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and purchasers.

(e)    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

REDACTED

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

265.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed Air Conditioning Systems(s) in California and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.\

(b)     During the Class Period, the Defendants' illegal conduct substantially affected California commerce and purchasers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

85

**REDACTED**

(e)     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of Air Conditioning Systems (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout California; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Air Conditioning Systems or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Air Conditioning Systems or vehicles in California, paid supracompetitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems, including in California.

(h)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(j)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

86

**REDACTED**

(k)      As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

266.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)      Defendants' unlawful conduct had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout Florida; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and purchasers.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

REDACTED

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Air Conditioning Systems were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for Air Conditioning Systems.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Air Conditioning Systems because they were unaware of the unlawful overcharge and because they had to purchase Air Conditioning Systems in order to be able to operate their vehicles.  The Defendants' conduct with regard to sales of Air Conditioning Systems, including their illegal conspiracy to secretly fix the price of Air Conditioning Systems at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiffs and the public.  The Defendants took grossly unfair advantage of Plaintiffs.

(c)    The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Air Conditioning Systems as set forth in N.M.S.A., § 57-12-2E,

REDACTED

due to the inflated prices paid by Plaintiffs and Class members for vehicles and Air Conditioning Systems.

(d)    Defendants' unlawful conduct had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems.

(e)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and purchasers.

(f)    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

268.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Air Conditioning Systems were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

**REDACTED**

(b)    Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Air Conditioning Systems they had purchased inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were paid by them.

(c)    The conduct of the Defendants described herein constitutes purchaser-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injury to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)    Because of the Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Air Conditioning Systems were misled to believe that they were paying a fair price for Air Conditioning Systems or the price increases for Air Conditioning Systems were for valid business reasons.

(e)    Defendants' unlawful conduct had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or Air Conditioning Systems  in New York, were deprived of free and open competition including in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or Air Conditioning Systems  in New York, paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems, including in New York.

REDACTED

      (f)     Defendants knew that their unlawful trade practices with respect to pricing Air Conditioning Systems would have an impact on all purchasers in New York and not just the Defendants' direct customers.

      (g)     Defendants knew that their unlawful trade practices with respect to pricing Air Conditioning Systems would have a broad impact, causing class members who indirectly purchased Air Conditioning Systems to be injured by paying more for Air Conditioning Systems than they would have paid in the absence of Defendants' unlawful trade acts and practices.

      (h)     During the Class Period, Defendants' marketed, sold, or distributed Air Conditioning Systems in New York, and Defendants' illegal conduct substantially affected New York commerce and purchasers.

      (i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Air Conditioning Systems in New York.

      (j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

269.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

      (a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Air Conditioning Systems were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

REDACTED

(b)    The conduct of the Defendants described herein constitutes purchaser-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in purchaser injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)    Defendants' unlawful conduct had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Air Conditioning Systems or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Air Conditioning Systems or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Air Conditioning Systems and vehicles containing Air Conditioning Systems, including in North Carolina.

(d)    During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Air Conditioning Systems and vehicles.  The Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by the Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of the Defendants' price-fixing conspiracy.  The Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware.  Moreover, the Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

**REDACTED**

(e)      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Air Conditioning Systems in North Carolina.

(f)      Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*[5]

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Air Conditioning Systems price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Air Conditioning Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Air Conditioning Systems.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

---

[5] Dealership Plaintiffs recognize that their claims under the South Carolina Unfair Trade Practices Act were dismissed in previous actions.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

REDACTED

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF

**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

271.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272.     Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, supra, except California. Plaintiffs also bring this claim under the laws of Missouri, Massachusetts, and Illinois on behalf of the Plaintiffs who are incorporated in or have their primary places of business in those three states and the class members in those three states.

273.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Air Conditioning Systems.

274.     Defendants have benefited from selling Air Conditioning Systems at artificially inflated and uncompetitive prices, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Air Conditioning Systems.

275.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiffs and the members

REDACTED

of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten

gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

276.    Pursuit of any remedies against the firms from which Plaintiffs and the members of the

Damages Class purchased Air Conditioning Systems and vehicles containing Air Conditioning Systems

subject to the Defendants' conspiracy would have been futile, given that those firms did not take part in the

Defendants' conspiracy.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a),

(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action,

as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member

of the Classes;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be

adjudged and decreed:

(a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman

Act;

(b)    A per se violation of Section 1 of the Sherman Act;

(c)    An unlawful combination, trust, agreement, understanding and/or concert of action in

violation of the state antitrust and unfair competition and consumer protection laws as set forth

herein; and

(d)    Acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent

allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of

**REDACTED**

the Damages Class be entered against the Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     The Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits the Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.     Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**REDACTED**

## **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  January 16, 2017                                            Respectfully submitted,

**MANTESE HONIGMAN, P.C.**
/s/ Gerard V. Mantese_____
Gerard V. Mantese
(Michigan Bar No. P34424)
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com

*Interim Liaison Counsel for Dealership Plaintiffs*

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**CUNEO GILBERT & LaDUCA, LLP**
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
David McMullan
Brian Herrington
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone:  (662) 834-2488
Facsimile:   (662)834-2628
dbarrett@barrettlawgroup.com

**REDACTED**

bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:   (651) 312-6618
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for Dealership
Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

I, Gerard V. Mantese, hereby certify that I caused a true and correct copy of SECOND
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT to be served via e-mail upon all registered
counsel of record via the Court's CM/ECF system on January 31, 2017.

<u>/s/ Gerard V. Mantese</u>
Gerard V. Mantese